**In re Kelly WEST, fka Kelly L. Rodriguez, Debtor.**

**Donald F. Harker, III, Chapter 7 Trustee, Plaintiff,**

v.

**Kelly West, Defendant.**

**Bankruptcy No. 01–34402. Adversary No. 02–3293.**

United States Bankruptcy Court, S.D. Ohio, Western Division at Dayton.

Jan. 12, 2004.

Jeffrey R. McQuiston, Dayton, OH, for Plaintiff.

W. Michael Conway, Dayton, OH, for Defendant.

Donald F. Harker, III, Dayton, OH, Chapter 7 Trustee.

## MEMORANDUM OPINION

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

Section 727(a) of the Bankruptcy Code provides that certain misconduct by the debtor will bar the grant of a discharge, including: (1) the transfer, with intent to hinder, delay, or defraud a creditor or officer of the bankruptcy estate, of (A) property of the debtor in the year preceding the filing of a bankruptcy petition, or (B) property of the estate after the bankruptcy filing; or (2) the making of a false oath or account in connection with a bankruptcy case. 11 U.S.C. § 727(a)(2) and (a)(4)(A). Donald Harker, the Chapter 7 Trustee ("Harker" or "Trustee"), has filed a complaint alleging that the Debtor, Kelly West ("West" or "Debtor"), concealed and attempted to dispose of jewelry that is property of her bankruptcy estate, turned over the jewelry to the Trustee in a piecemeal manner, grossly undervalued the jewelry in the schedule of assets filed with her bankruptcy petition, and transferred several pieces of jewelry to her sister and others in the year preceding her bankruptcy filing. The evidence presented at trial established that while West did not knowingly and fraudulently undervalue her jewelry, she concealed a diamond and sapphire ring from the Trustee, attempted to sell the ring or trade it for another piece of jewelry, and failed to turn the ring over to the Trustee until well after her misconduct had been discovered. The Court therefore holds that the Debtor's discharge must be denied.

This memorandum opinion constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52 (made applicable here by Fed. R. Bankr.P. 7052 and 9014).

## I. Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. 28 U.S.C. § 157(b)(2).

## II. Factual and Procedural Background

### A. The Debtor's Income, Physical Condition, and Educational Background

West, a 37-year old single mother, filed her voluntary Chapter 7 bankruptcy petition on June 21, 2001 (the "Petition Date"). West has been diagnosed with chronic fatigue syndrome and fibromyalgia and is unable to work. Trial Transcript ("Tr.") at 5–6. She became ill approximately eight years ago while pregnant with her daughter. Tr. at 154. At present, the Debtor has three sources of income: monthly long-term disability insurance benefits of $1778.22; monthly Social Security disability payments of $1440; and monthly child support payments of $600. Schedule I—Current Income of Individual Debtor(s); Tr. at 7. West was determined to be eligible for long-term disability insurance benefits in 1996 and for Social Security disability payments in 1997. Payment of these disability benefits was made retro-

active to 1995. Tr. at 153.[1] Prior to becoming disabled, West was employed by Lexis–Nexis as an account executive. She has a master's degree in international business and marketing from Pepperdine University and an undergraduate degree from Wright State University. Tr. at 5.

## B. The Debtor's Scheduled Assets and Liabilities

The schedules of assets and liabilities that the Debtor filed with her bankruptcy petition suggest that West enjoyed a lavish lifestyle prior to the Petition Date. Her recently-built home in a small town was valued at $300,000, she drove a late-model Mercedes, and she listed a number of debts arising from jewelry purchases. Her schedules list unsecured debts totaling nearly a quarter million dollars. Some $79,000 of this amount is credit card debt owing to Saks Fifth Avenue, Nieman Marcus, and Lazarus department stores. The schedules also include medical bills and a substantial amount of debt arising from the construction of her home.

On her Schedule D (Creditors Holding Secured Claims), West listed two mortgages totaling $299,000. She also listed approximately $69,000 in other secured debt, $31,000 of which is attributable to an auto loan for a 2001 Mercedes C240 purchased shortly before the bankruptcy filing. With the exception of a $635 debt for a stereo, the remainder of West's secured debt arose from jewelry purchases.[2] The Debtor listed five creditors holding liens on jewelry: American General, Borsheim's,

Jewelry Express/GE Capital Consumer Card Co. ("Jewelry Express"), Saks Fifth Avenue, and Wells Fargo. The debts secured by liens on jewelry amount to $32,689.46. Schedule D states the value of all of the jewelry securing the liens as zero. On her Schedule B (Personal Property), however, Debtor listed "Jewelry— Various items" with a total value of $2,000. Although Debtor's schedules do not include an itemization of her jewelry, West testified at trial that on the Petition Date she owned the 10 items of jewelry listed on the chart set forth below on page 5 of this opinion (the "Chart"). On her Schedule C (Property Claimed as Exempt), the Debtor claimed a $400 exemption in jewelry.

## C. The Debtor's Alleged Undervaluation of Jewelry

The Trustee's Complaint alleges that the Debtor knowingly and fraudulently made a false oath by grossly undervaluing the jewelry in her schedules. At trial, the Trustee and the Debtor each called expert witnesses who offered opinions concerning the value of Debtor's jewelry. The Trustee called Michael Karaman ("Karaman"), owner of James Free Jewelers, and the Debtor called Daniel Klawon ("Klawon"), proprietor of Dan Klawon's Estate Sale Service. Both Karaman and Klawon testified regarding their respective appraisals of the jewelry. The Debtor also offered her opinion of the aggregate value of the jewelry that she owned on the Petition Date. The testimony offered by Karaman, Klawon, and the Debtor is summarized in the Chart below.

---

**1.** No evidence was offered to establish the date that West ceased working.

**2.** No testimony was offered at trial to explain why a single parent living on disability benefits of $3800 per month was building a $300,000 house, driving a luxury automobile, and regularly purchasing jewelry.

| | | Karaman Appraisal | Klawon Appraisal | Debtor's Purchase Price | Scheduled Value |
|---|---|---|---|---|---|
| 1 | Platinum band with diamonds | $1000 Pl.Ex. 8 Tr. at 103 | Def. Ex. A Tr. at 141 $825 | $6000 Tr. at 16 | |
| 2 | Platinum band with diamonds | $1000 Pl.Ex. 8 Tr. at 103 | Appraised as a set | Purchased as a set | |
| 3 | Oval cut loose diamond 1.01 carat | $2800 Pl. Ex. 9 Tr. at 106 | $3000 Def. Ex. A Tr. at 142 | $4500 Tr. at 19 | |
| 4 | Gold ring with heart-shaped diamond | $750 Pl. Ex. 9 Tr. at 107 | $415 Def. Ex. A Tr. at 142 | $4000 Tr. at 20 | Aggregate value |
| 5 | Platinum ring with heart-shaped diamond | $750 Pl. Ex. 9 Tr. at 107 | $520 Def. Ex. A | Purchased as a set | all pieces $2000 |
| 6 | Platinum ring with tanzanite and diamonds | $1000 Pl. Ex. 9 Tr. at 108 | $500 Def. Ex. A Tr. at 143 | $4117 Tr. at 22 | |
| 7 | Ten diamond/platinum anniversary band | $600 Pl. Ex. 9 Tr. at 109 | No appraisal | $11,500 Tr. at 24–25 Purchased with spring-wire bracelet | |
| 8 | Diamond and sapphire ring | $1000 Tr. at 101–02 | $355 Def. Ex. A | No testimony provided | |
| 9 | Spring-wire, gold and diamond bracelet | No appraisal | No appraisal | | |
| 10 | Watch | No appraisal | No appraisal | | |
| Pawnshop value of all items | | None given | $3860 Tr. at 144 | | $2000 Tr. at 156 |
| Wholesale value of all items | | None given | $5615 Tr. at 144 | | |
| Retail value of all items | | $8900 | $7000 Tr. at 144 | | |

Karaman opined that the aggregate retail value of the first eight items of jewelry listed on the Chart is $8,900. Klawon assessed seven of the eight pieces of jewelry appraised by Karaman and arrived at a retail value for those items of $7,000. Klawon did not appraise the diamond and platinum anniversary band listed in the Chart as Item 7 (the "Platinum Ring"). Had Klawon appraised the Platinum Ring, his opinion of the aggregate retail value of the jewelry presumably would have been closer to Karaman's total. Neither Karaman nor Klawon appraised the bracelet or the watch listed in the Chart as Items 9 and 10.

In her schedules, West listed the total value of all the jewelry at $2,000. She testified at trial that the $2,000 amount represented her opinion of the jewelry's so-called "pawnshop" value. Karaman did not offer his opinion of the jewelry's pawn-

shop value; Klawon's opinion of pawnshop value of the seven items he appraised was $3,860. Thus, Klawon's opinion of the pawnshop value of the jewelry was nearly twice that of the Debtor's, and he appraised only 7 of the 10 pieces listed in the Chart. Because Karaman did not offer an opinion as to either the pawnshop or wholesale value of the jewelry, the only basis for comparison of the expert opinions of Klawon and Karaman is at retail value.

West testified that she was instructed by Christopher Bennington ("Bennington")—the attorney who prepared, signed, and filed her Chapter 7 petition—to value the jewelry in her schedules at its pawnshop value.[3] In response to a question from Conway as to how she arrived at a value of $2,000 for her jewelry, West testified:

Conway: Do you know where that number came from?

West: I believe at the time Mr. Bennington told me when I valued my household items and my jewelry items, he said that Trustee Redford,[4] who is obviously not the [t]rustee that I got, said to depreciate household goods over two years and for jewelry he wanted pawn shop value, and so that was my opinion.

Conway: The $2,000 was your opinion?

West: I believe so.

Conway: And what were you thinking about as far as a definition of value at that time? You obviously weren't thinking about retail because you paid a lot more for them, right?

West: Of course, and I indicated that, when I put the items on the Schedule[.] I put how much I

paid for them, so, but he said pawn shop value, which it's not very much that you get for things in a pawn shop.

Conway: Do you have any expertise in appraising jewelry or any specific knowledge about the value of jewelry?

West: No.

.     .     .     .     .

Conway: Okay. Do you have any opinion other than $2,000 as to the value of all of the jewelry that you've turned over to Mr. Harker?

West: [T]oday ... if I went to a jewelry store or I went to a pawn shop, ... I would be lucky to get $2,000.00.

Tr. at 156, 164.

On both direct and cross-examination, West testified that Bennington made the decision to list the value of the jewelry as zero on her Schedule D. On direct examination, West testified:

Conway: On your petition there are the secured debts listed but there is zero value for all of them. Why did you report them as zero value?

West: I did not list zero for them because the stuff I could remember I was very conscientious about listing everything, every person that I owed and I listed the amount that I owed. So I intended to disclose everything there, but I did not put down zero for the value.

---

**3.** Bennington did not represent West in this adversary proceeding. Her trial counsel in the adversary proceeding was Michael Conway ("Conway").

**4.** The Debtor's reference is to George Ledford, former standing Chapter 13 Trustee in the Dayton Division of the Southern District of Ohio.

Tr. at 160. On cross-examination by the Trustee's counsel, Jeffrey McQuiston, she added:

McQuiston: You say Mr. Bennington supplied you with certain forms that you completed, is that right?

West: Yes.

McQuiston: And if I'm understanding your testimony correctly, it's your opinion that Mr. Bennington, for whatever reason, did not properly record the information that you provided to him; is that right?

West: Yes.

Tr. at 166.

West filed a statement of intention in which she expressed her intent to surrender certain pieces of jewelry to American General, Borsheim's, Gateway Credit Card, Jewelry Express, Saks Fifth Avenue, and Wells Fargo. As of November 13, 2001, the claims bar date set in the Chapter 7 case, four of these creditors[5] had filed proofs of claim. Only Borsheim's sought the return of the jewelry on which it claimed a lien and, after receiving the pieces back from the Debtor, the Trustee returned the jewelry to Borsheim's at the end of 2002.

### D. The Debtor's Alleged Concealment of Jewelry

Harker testified that upon reviewing the Debtor's schedules he questioned their accuracy and had concerns about the debts and assets listed. As a result, in addition to questioning the Debtor at the August 3, 2001 meeting of creditors (the "Creditors'

Meeting"), the Trustee conducted a Fed. R. Bankr.P. 2004 examination of the Debtor on September 25, 2001 (the "First 2004 Examination"), which was continued and completed on February 25, 2002 (the "Continued 2004 Examination"). The Debtor also was deposed by the Trustee on February 14, 2003 (the "Deposition") in preparation for trial.

At trial, the Trustee explained his questions and concerns about the Debtor's schedules:

McQuiston: Now, during the course of that examination at the [Creditors' Meeting], you became aware of the fact that there was jewelry involved in this case, is that right?

Harker: Correct. We reviewed the petition and schedules prior to the [Creditors' Meeting] and what struck me as rather odd about this was, if I look at Schedule D I'm seeing Saks Fifth Avenue, Wells Fargo, Jewelry Express, I'm seeing a lot of creditors which reflect, according to the schedules, the purchase of significant amounts of jewelry, more than thirty or forty thousand. And then I look at Schedule B and I see jewelry, two thousand bucks. And I'm thinking to myself, well, gosh, either somebody grossly overpaid for these items or something happened to them, where are they, because how could you have paid forty thousand or so for jewel-

5. GE Capital Consumer Card filed a claim on behalf of Jewelry Express for $4,765.77, designating the claim as unsecured (Claim No. 5). Borsheim's filed a proof of claim (Claim No. 10) for $11,736.26, but did not specify whether it was filing as a secured or unse-

cured claimant. American General filed a claim (Claim No. 12) for $4,170.75 and specified that its claim was secured by jewelry. Saks Fifth Avenue filed an unsecured, nonpriority claim for $23,283.64 (Claim No. 15).

ry and now it's only worth two grand? So I had some suspicions about that.

Then I was also concerned ... [that] the debtor ... was unemployed ... [and was receiving] disability insurance payments and social security, and ... I couldn't believe that she would be able to purchase a brand new Mercedes automobile and be in bankruptcy.

Tr. at 44–45.

Several weeks after the Creditors' Meeting, Harker conducted the First 2004 Examination. At the First 2004 Examination, he instructed the Debtor to surrender all of her jewelry to him. He testified as follows:

Harker: I did tell Ms. West to make arrangements to turn over all jewelry to my office. I was quite explicit about that. I even told her that when she was ready to bring it in to call the office to make sure that either I or my secretary was there so that we could properly acknowledge receipt of those items.

Tr. at 46. Rather than turn over all of her jewelry to the Trustee at one time, West turned the jewelry over to Harker piece by piece. West's incremental compliance with the Trustee's request for the turnover of all jewelry is one of the bases for his contention that the Debtor concealed assets of the estate. The first few items of jewelry were turned over to the Trustee approximately three weeks after the Creditors' Meeting. On August 23, 2001, the Debtor brought to the Trustee's office the first six items of jewelry listed on the Chart. At the First 2004 Examination, the Debtor turned over the Platinum Ring (*see* Chart, Item 7). And on November 26, 2001, at the conclusion of a hearing on an unrelated matter (the "November 2001 Hearing"), the Debtor turned over the bracelet listed in the Chart as Item 9. Finally, on January 10, 2003, the Debtor turned over the diamond and sapphire ring listed in the Chart as Item 8 (the "Sapphire Ring"). The Trustee testified that each time West turned over jewelry he asked her if she had given him everything and each time she replied in the affirmative. Tr. at 47–49.

The piece of jewelry on which the Trustee's allegation of concealment primarily focuses is the one with the lowest monetary value—the Sapphire Ring. According to the Trustee, West concealed and attempted to sell the Sapphire Ring or trade it for a different piece of jewelry. This alleged conduct, together with the Debtor's piecemeal turnover of the other jewelry, form the basis of the Trustee's contention that West concealed assets of the estate in an attempt to hinder, delay, or defraud creditors.

In late October 2001, the Trustee visited James Free Jewelers for the purpose of obtaining an appraisal of the jewelry he had received from the Debtor up to that point. While at James Free Jewelers, Harker was informed by Karaman that West had recently visited the store and attempted to sell or trade the Sapphire Ring. Both Karaman and Randall Ihle ("Ihle"), a salesman at James Free Jewelers, testified that West had come to the store with the Sapphire Ring and had inquired about either selling it or trading it for another piece of jewelry. Tr. at 72, 74, 89. Karaman declined to purchase or exchange the Sapphire Ring because James Free Jewelers had a similar ring in inventory. Tr. at 75, 90–91. Ihle testified that West did not have any other jewelry with her at the time (Tr. at 81) and did not ask to have the Sapphire Ring sized (Tr. at 74, 79). Karaman stated that, due to the engraving on the Sapphire Ring and the placement of the stones, sizing it properly at the store would have been difficult. Tr.

at 93. He believed that sizing would most likely have to be done by the manufacturer. *Id.*

Upon learning of the existence of the Sapphire Ring, Harker placed a call to West's counsel and demanded that it be turned over immediately. The date of that phone call is unknown, but the parties stipulated that the call was placed to counsel shortly after Harker learned of the existence of the Sapphire Ring from Karaman. Thus, West's counsel was presumably informed of the existence of the Sapphire Ring in late 2001. After receiving Harker's call, Conway telephoned West and instructed her to turn over the Sapphire Ring.

On May 30, 2002, the Trustee filed his Complaint to Deny Discharge. Paragraph 11 of the Complaint states that:

Despite Defendant's assurances that all jewelry had been turned over, in the latter part of October 2001, Defendant sought to trade in or upgrade a sapphire eternity band ring with settings of sapphires and diamonds ... at James Free Jewelers. Defendant's failure to disclose to Plaintiff the existence of the sapphire ring or the attempt to trade in or upgrade the sapphire ring constitutes an attempt to hinder or defraud creditors of this estate or the Trustee so as to prevent Defendant's discharge under 11 U.S.C. § 727(a)(2)(B).

Complaint ¶ 11. It was not until January 2003, some 14 months after Harker learned of the existence of the Sapphire Ring, more than a year after her counsel had instructed her to turn it over, and over six months after the filing of the Complaint, that West actually gave the Sapphire Ring to Harker.

West's testimony regarding her delay in turning over the Sapphire Ring to the Trustee and her dealings with James Free Jewelers was marked by evasiveness and self-contradiction. Initially, on cross-examination, West stated that she did not turn over the Sapphire Ring to the Trustee because she "didn't know I had it." Tr. at 31. Later, she said her daughter found it among a bag of costume jewelry. Tr. 31–32. When asked if she took the Sapphire Ring to James Free Jewelers to have it sized after her daughter found it, she could not remember. Tr. at 32. When she was confronted with her earlier testimony, West conceded that the following exchange had taken place at the Deposition:

McQuiston: Question: What did you do when you discovered your daughter playing with the ring? Answer: Well, I was looking at it going where did this come from. She's like, oh, it's in this bag, and she brought this bag. As a matter of fact, I saw the bag yesterday with holes in it because I said, 'Where did you get this?' And she goes, she's like pointed out, 'It was in here.' And so at some point I remember it doesn't fit me and I think that's why I took it into James Free to have it sized to see if they could do something with the size.[6]

Tr. at 33.

When asked why she had not disclosed the existence of the Sapphire Ring after it

---

6. In fact, both Karaman and Ihle, upon examining the Sapphire Ring at trial, testified that it had been sized sometime after West brought it to James Free Jewelers in the fall of 2001. Tr. at 75–76, 80, 82, 91–92, 94.

Both testified that the Sapphire Ring had not been sized in a professional manner. Karaman asserted that the poor sizing job had decreased the Sapphire Ring's value from be-

was discovered, West replied: "I didn't think it was worth anything." Tr. at 33. When asked at the Continued 2004 Examination (conducted on February 25, 2002) if she had been to James Free Jewelers at any time within the prior year, West denied that she had been to the store during that time period. The Trustee's counsel inquired as to whether West had been to James Free Jewelers to sell or upgrade a ring. In response, West admitted going to the store, but only to return an engagement ring from her former fiancé. Tr. at 52, 173. At trial, on direct examination by her counsel, she was asked how she became aware that she had the Sapphire Ring Her reply was: "I didn't become aware that I had it until I was called and asked about it." Tr. at 161. According to West, she had "put it away somewhere and then had just forgotten about where I put it." Tr. at 163. After this exchange, on cross-examination, Trustee's counsel posed the following questions to the Debtor:

McQuiston: Okay. Now let's talk about this ring. Is it fair to say, Ms. West, that had Mr. Harker not run into Mr. Karaman and Mr. Harker not contacted you, that he would still not have that sapphire and diamond ring; isn't that fair to say?

West: I wouldn't have thought that it was important; the value was so low on it, I just, I didn't think it was a significant part of the estate.

. . . . .

McQuiston: I'm trying to understand your testimony because you say you discovered this but you thought it wasn't— I'm not putting words in your mouth—you tell me, but I understood you to

tween $1600 and $1800 to $1000. Tr. at

say that you didn't think you had to disclose this to him because you didn't think it was worth enough.

West: I didn't think it was worth anything, I mean, or very little.

McQuiston: Well, it has sapphires and diamonds in it. You knew that, didn't you?

West: Yes.

McQuiston: Those are, would you agree with me that they're precious stones?

West: I think sapphires are semi-precious.

McQuiston: Okay, are diamonds precious stones?

West: Yes.

. . . . .

McQuiston: Did you deny being in James Free Jewelers trying to trade a sapphire and diamond ring, to Mr. Harker?

West: I don't recall being in James Free Jewelers with that ring; I don't remember.

Tr. at 170–73. On re-direct examination, the Debtor added:

Conway: Do you have any present memory of having taken the . . . diamond and sapphire ring to James Free Jewelers?

West: People say I was there, and I might have been there, but if I had taken that ring any place it would have been to have it, get it sized, because it doesn't fit me.

Tr. at 173.

Thus, at trial and in pre-trial proceedings, West testified, alternatively, that she: (1) did not know that she had the Sapphire

100–01.

ring at all; (2) did not become aware that she had the Sapphire Ring until Conway called her following his conversation with the Trustee; (3) did know that she had the Sapphire Ring, but did not turn it over because it lacked significant value; (4) had the Sapphire Ring and took it to James Free Jewelers to have it sized; and (5) had the Sapphire Ring, but never took it to James Free Jewelers.

### E. Debtor's Alleged Transfer of Jewelry With Intent to Defraud

In addition to the Sapphire Ring, the Debtor gave two other pieces to Harker after the initial turnover of jewelry—the Platinum Ring (*see* Chart, Item 7), turned over at the First 2004 Examination, and the bracelet listed in the Chart as Item 9, which was turned over at the November 2001 Hearing. According to the Trustee, West transferred these two pieces, along with a watch (*see* Chart, Item 10) that was allegedly given to a "friend of a friend" prior to the Petition Date, for inadequate consideration in an attempt to hinder, delay, or defraud her creditors. West attributed the piecemeal turnover of these items to Harker to her faulty memory. She testified that she had forgotten that she had sold the Platinum Ring and bracelet to her sister and did not recall the jewelry's whereabouts until she saw her sister wearing these pieces on separate occasions. Tr. at 26, 160–61. She sold these items to her sister, West testified, in order to raise money to pay her propane bill and other debts related to the construction of her house. Tr. at 26. West's sister, Courtney McNamee ("McNamee"), testified that in late summer or early fall of 2000 or 2001 she agreed to buy the two pieces, but could not remember the amount she had promised to pay, and in any event, never made a payment. Tr. at 121, 133. West also testified that no payments were ever made by her sister, although according to a portion of her testimony from the Creditors'

Meeting that was read into the record, her sister had been paying her monthly, and had paid her "less than, probably $500." Tr. at 26, 28. At trial, West could not recall this earlier testimony. McNamee testified that she returned the Platinum Ring to West in September of 2001 and the bracelet in November of 2001, after West asked for them. Tr. at 134–35.

West also testified at the Creditors' Meeting that she had transferred some of her jewelry to a "friend of a friend" in the year preceding her bankruptcy filing:

McQuiston: I'll ask Ms. West whether you recall Mr. Harker asking you the following questions and you providing the following answers. "Question: Okay, you bought some, bought some jewelry from Saks Fifth Avenue? Answer: Yes. Question: Do you still have that? Answer: No, I don't. Question: What happened, what kind of jewelry was it? Answer: I believe it was a watch. Question: What kind of watch? Answer: I forget the name of it, the brand. Question: Do you remember when you would have purchased that? Answer: Might have been last spring. Question: Last spring? Answer: Uh huh. Question: What happened to the watch? Answer: I sold that to someone. Question: Do you know who you sold it to? Answer: No. That was a friend of a friend." Do you recall providing those answers to the questions I've indicated?

West: I don't recall.

Tr. at 37.

West attributes her inability to clearly remember the existence or whereabouts of the jewelry to her medical condition. West testified that she is under the care of several physicians and takes a number of prescribed medications for pain relief and memory problems. Tr. at 184—85.

McNamee testified that West's personality changed when she became ill at the time of her pregnancy:

Conway: [W]ould you describe Kelly today.

McNamee: My sister is very sick; she is moody, she jumps to unreasonable conclusions, she doesn't think things through all the way; she has no memory. I mean, I'm sure she has some form of memory but her memory is nothing compared to how it used to be. I personally feel that if she's not writing something down she's not going to remember anything. She's hard to have conversations with. She is a different person.

Tr. at 129–30. The testimony regarding West's physical condition and mental state was not rebutted, nor was it corroborated by testimony from any medical professional.

## III. Legal Analysis

### A. Objections to Discharge—General Principles

"[T]he dual purposes of a Chapter 7 bankruptcy are to grant the honest debtor a discharge of his or her prepetition debts, and to provide a mechanism for the fair and orderly distribution of the debtor's assets that are subject to administration by the Trustee." *See also North River Ins. Co. v. Baskowitz (In re Baskowitz),* 194 B.R. 839, 843 (Bankr.E.D.Mo.1996). *Village of San Jose v. McWilliams,* 284 F.3d 785, 790 (7th Cir.2002) ("The purpose of the Code is 'to relieve the honest debtor from the weight of oppressive indebtedness and to permit him to start afresh free from the obligations and responsibilities consequent upon [financial] misfortunes.' " (quoting *Williams v. United States Fid. & Guar. Co.,* 236 U.S. 549, 554–55, 35 S.Ct. 289, 59 L.Ed. 713 (1915))). "[C]onsistent with the Code, bankruptcy protection and discharge may be denied to a debtor who was less than honest." *McWilliams,* 284 F.3d at 790. *See Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) ("But in the same breath that we have invoked this 'fresh start' policy, we have been careful to explain that the [Code] limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.' " (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934))); *Mayer v. Spanel Int'l Ltd.,* 51 F.3d 670, 674 (7th Cir.1995) ("Congress concluded that preventing fraud is more important than letting defrauders start over with a clean slate . . . .").

Section 727(a) of the Bankruptcy Code, which enumerates grounds for a denial of a debtor's discharge, provides in pertinent part as follows:

(a) The court shall grant the debtor a discharge, unless—

. . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

. . . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

. . . .

11 U.S.C. § 727(a)(2) and (4)(A).

■ Federal Rule of Bankruptcy Procedure 4005 places the burden of proof on the party objecting to the debtor's discharge. Fed. R. Bankr.P. 4005; *McClendon v. DeVoll (In re DeVoll)*, 266 B.R. 81, 97 (Bankr.N.D.Tex.2001). Grounds for denial of a debtor's discharge must be established by a preponderance of the evidence. *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir.2000) ("The elements of a violation of 11 U.S.C. § 727 must be proven by a preponderance of the evidence to merit denial of discharge."); *Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 394 (6th Cir.1994), *cert. denied*, 513 U.S. 1111, 115 S.Ct. 903, 130 L.Ed.2d 786 (1995) (same). Given the Code's remedial purpose, and because a total bar to discharge is an extreme penalty, § 727(a) exceptions to discharge must be construed liberally in favor of the debtor and strictly against the objecting party. *Keeney*, 227 F.3d at 683 ("The Bankruptcy Code should be construed liberally in favor of the debtor."); *Miller v. Bauer (In re Bauer)*, 290 B.R. 568, 581 (Bankr.S.D.Ohio 2003) ("Objections to discharge are strictly construed against the moving party and liberally in favor of debtors to foster the 'fresh start' goal of the Code."); *Hunter v. Sowers (In re Sowers)*, 229 B.R. 151, 156 (Bankr.N.D.Ohio 1998) ("[T]he law favors a discharge in bankruptcy, and thus the statutory provisions which completely deny a discharge to a debtor must be liberally construed in the debtor's favor.").

**B. The Alleged Grounds for Denial of Discharge**

■ The Trustee objects to the Debtor's discharge on several grounds. The Trustee asserts that the Debtor's discharge should be denied under § 727(a)(2) of the Code because West, with intent to hinder, delay, or defraud her creditors: (1) transferred several pieces of jewelry to her sister and a "friend of a friend" in the year preceding the Petition Date; and (2) concealed and attempted to sell or trade the Sapphire Ring after filing her bankruptcy petition. *See* 11 U.S.C. § 727(a)(2)(A) and (B). The Trustee also maintains that West knowingly made a false oath by grossly undervaluing her jewelry in the schedule of assets she filed with the Court. *See* 11 U.S.C. § 727(a)(4)(A). These alleged grounds for denial of the Debtor's discharge are addressed below in the order in which they were presented at trial.

**C. Alleged Undervaluation of the Jewelry**

■ Section 727(a)(4)(A) of the Code provides that a discharge must be denied a debtor who knowingly and fraudulently makes a false oath in, or in connection with, a bankruptcy case. As the First Circuit stated in *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir.1987):

[T]he very purpose of … § 727(a)(4)(A) is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. … Neither the trustee nor the creditors should be re-

quired to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.

*See also Oldendorf v. Buckman,* 173 B.R. 99, 104 (E.D.La.1994) ("The purpose of § 727(a)(4)(A) is to insure that adequate information is available to those interested in the administration of the bankruptcy estate without the need of examinations or investigations to determine whether the information provided is true."). A party objecting to a debtor's discharge under § 727(a)(4)(A) must establish that (1) the debtor made a statement under oath, (2) the statement related materially to the bankruptcy case, (3) the statement was false, (4) the debtor had knowledge of the statement's falsity, and (5) the debtor made the statement with fraudulent intent. *Keeney,* 227 F.3d at 685; *Sowers,* 229 B.R. at 158.

■ Statements made in a debtor's petition, schedules, and statement of financial affairs are made under oath. *Hamo v. Wilson (In re Hamo),* 233 B.R. 718, 725 (6th Cir. BAP 1999) ("Statements in bankruptcy schedules are given under oath...."); *Sowers,* 229 B.R. at 158 ("[T]here is no question that ... statements or omissions contained in a debtor's Bankruptcy Schedules qualify as occurring under oath for purposes of § 727(a)(4)(A)."). Thus, West's representation in her schedules concerning the value of the jewelry constitutes a statement under oath for purposes of § 727(a)(4)(A).

■ "The subject of a false oath is material if it 'bears a relationship to the [debtor's] business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'" *Keeney,* 227 F.3d

at 686 (quoting *Beaubouef v. Beaubouef (In re Beaubouef),* 966 F.2d 174, 178 (5th Cir.1992) (internal quotation omitted)). *See also Hamo,* 233 B.R. at 725 ("[A] fact is material if it 'concerns discovery of assets, business dealings or [the] existence or disposition of property.'" (quoting *Sowers,* 229 B.R. at 158)). Here, the Debtor's representation of the jewelry's value in her schedules related to valuable assets of the estate and, thus, was material.

There is no question that West understated the value of the jewelry in her schedules. While the Court need not make a determination of the jewelry's value in order to adjudicate the Trustee's § 727(a)(4)(A) claim, the parties' respective expert witnesses testified at trial that the aggregate value of the jewelry ranged from a high of $8,900 (Karaman's opinion of the jewelry's total retail value) to a low of $3,860 (Klawon's opinion of the jewelry's total pawnshop value).[7] In her Schedule B, West listed the total value of all of her jewelry as $2,000. Even if the Court were to accept the expert testimony most favorable to the Debtor (Klawon's $3,860 estimate of the jewelry's pawnshop value—which, again, included only 7 of the 10 pieces of jewelry), the fact remains that West undervalued the jewelry in her schedules and thus made a false statement under oath.

■ The final two elements of a § 727(a)(4)(A) claim are knowledge of falsity and intent to deceive. A debtor's knowledge that a statement is false

> may be shown by demonstrating that the debtor knew the truth, but nonetheless failed to give the information or gave contradictory information. A false statement or omission that is made by

---

7. Presumably, the expert witnesses' respective opinions of the jewelry's total value—whether at retail or liquidation value—would have exceeded the figures offered at trial since neither Karaman nor Klawon appraised all 10

pieces of jewelry that the Debtor owned on the Petition Date. As the Chart reflects, Klawon appraised 7 of the 10 pieces and Karaman 8 of the 10 pieces.

mistake or inadvertence is not sufficient grounds upon which to base the denial of a discharge, but a knowingly false statement or omission made by the debtor with reckless indifference to the truth will suffice as grounds for denial of a Chapter 7 general discharge.

*Hamo,* 233 B.R. at 725 (citations omitted). "A debtor's [fraudulent intent] may be inferred from circumstantial evidence or 'from the debtor's course of conduct.'" *Id.* at 724 (quoting *Sowers,* 229 B.R. at 159; *Fahey Banking Co. v. Parsell (In re Parsell),* 172 B.R. 226, 231 (Bankr.N.D.Ohio 1994)). *See also McWilliams,* 284 F.3d at 790 ("[B]ecause it is unlikely that the debtor will admit fraud, intent may be established by circumstantial evidence."); *Williamson v. Fireman's Fund Ins. Co.,* 828 F.2d 249, 252 (4th Cir.1987) ("[C]ourts may deduce fraudulent intent from all the facts and circumstances of a case."). Often, resolution of the question of whether a false statement was made with intent to deceive will turn on the Court's assessment of the demeanor and credibility of the debtor. *Groman v. Watman (In re Watman),* 301 F.3d 3, 8 (1st Cir.2002).

The Trustee argues that West knowingly and fraudulently undervalued the jewelry by listing its total value at $2,000 in her schedules. According to the Trustee, West surely must have known that 10 pieces of jewelry originally purchased for more than $30,000 had a value much greater than $2,000. Further, the Trustee maintains that the expert testimony offered by Karaman—who pegged the total retail value of the eight pieces of jewelry he appraised at $8,900—shows that the Debtor's $2,000 valuation was so far off the mark that it must necessarily be deemed

to be a knowing and fraudulent misrepresentation on her part. West, on the other hand, asserts that she arrived at the $2,000 valuation for the jewelry simply by following her bankruptcy counsel's instruction to list her jewelry at its pawnshop value. West testified at trial that she believed at the time she filed her bankruptcy petition, and continues to believe, that she would receive no more than $2,000 if she attempted to sell all of the jewelry at a pawnshop. The Debtor also submits that if she had intended to conceal the existence of her jewelry, or create the false impression that it had minimal value, she would not have disclosed in her Schedule D (Creditors Holding Secured Claims) the fact that she owed in excess of $35,000 to five creditors whose claims were secured by jewelry (American General, Borsheim's, Jewelry Express, Saks Fifth Avenue, and Wells Fargo).

■ Having weighed the evidence, the Court concludes that West's undervaluation of the jewelry in her schedules does not constitute a knowing and fraudulent misrepresentation within the meaning of § 727(a)(4)(A). The Debtor's testimony—that she listed the jewelry's total value at $2,000 based on Bennington's instruction to estimate what the jewelry would bring if it were sold at a pawnshop—was credible. Bennington's advice to West appears to have been based on his misunderstanding of the appropriate standard for valuing property listed in a debtor's schedules. While the caselaw is sparse on the subject, the majority, and better-reasoned, line of authority holds that personal property should be listed in the debtor's schedules at fair-market, rather than liquidation, or distressed-sale, value.[8] But while West

---

**8.** Federal Rule of Bankruptcy Procedure 1007(b)(1) requires the filing of "schedules of assets and liabilities ... prepared as prescribed by the appropriate Official Forms." Official Form No. 6 directs the debtor to set

forth in Schedule A (Real Estate), Schedule B (Personal Property), and Schedule C (Property Claimed as Exempt) the "current market value of debtor's interest in property." The phrase "market value" is not defined in either

may have been advised by her bankruptcy counsel to utilize a valuation standard that has not gained acceptance, the Court is not persuaded that she acted in bad faith by relying on his instruction to list her jewelry at its pawnshop, or liquidation, value. *See First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir.1986) ("Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts."); *Cuervo v. Snell (In re Snell)*, 240 B.R. 728, 730 (Bankr.S.D.Ohio 1999) ("Courts have held that actual intent to ... [defraud] a creditor can be negated by reliance upon the advice of an attorney."); *OnBank & Trust Co. v. Siddell (In re Siddell)*, 191 B.R. 544, 554 (Bankr. N.D.N.Y.1996) ("[W]here the debtor's reliance is reasonable and in good faith, 'the advice of counsel may ... negate the inference of fraudulent intent.'" (quoting *Aetna Ins. Co. v. Nazarian (In re Nazarian)*, 18 B.R. 143, 147 (Bankr.D.Md.1982))). And if the Court accepts the premise that West relied reasonably and in good faith on Bennington's advice to list her jewelry at its pawnshop value, then her $2,000 estimate based on this valuation standard value does not appear to be so far off the mark as to suggest an intent to defraud. The only expert testimony offered as to the jewelry's pawnshop value was Klawon's opinion that the seven pieces of jewelry he appraised had a pawnshop value of $3,860. The variance between Klawon's opinion of the jewelry's pawnshop value and West's $2,000 figure is not so pronounced as to indicate that the Debtor's valuation estimate was fraudulently made.

the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure. The few courts that have interpreted the phrase "market value" have done so in the context of determining whether property has been properly valued in the debtor's schedules for exemption purposes. With only two exceptions, the courts that have considered the question have concluded that property should be listed in a debtor's schedules and valued for exemption purposes at its fair market value. *See, e.g., In re Sumerell*, 194 B.R. 818, 827 (Bankr. E.D.Tenn.1996) (property should be listed in bankruptcy schedules at its fair market value, which is the price that a willing seller not under *compulsion to sell and a willing buyer* not under compulsion to buy agree upon "after the property has been exposed to the market for a reasonable amount of time" (quoting *In re Markowitz Bldg. Co.*, 84 B.R. 484, 487 (Bankr.N.D.Ohio 1988))); *In re Todd*, 194 B.R. 893, 896 (Bankr.D.Mont.1996) (debtor's residence should be valued at an amount that the debtor would receive from a willing and reasonable buyer when debtor was not under a compulsion to sell); *In re Mitchell*, 103 B.R. 819, 824–25 (Bankr.W.D.Tex.1989) (diamond ring should be listed at its fair market value rather than liquidation value). *But see Spencer v. Blanchard (In re Blanchard)*, 201 B.R. 108, 129–30 (Bankr.E.D.Pa.1996) (holding that, while "single valuable pieces[s] of household furnishings, as well as jewelry and other liquid assets" should be listed at fair market value, "liquidation valuation may well be appropriate" for "general household goods"); *In re Walsh*, 5 B.R. 239, 240–41 (Bankr. D.D.C.1980) (debtor's assets should be listed for exemption purposes at liquidation value). Thus, Bennington's instruction to the Debtor to schedule her jewelry at pawnshop value (which is simply a different manner of expressing liquidation, or distressed sale, value) ran counter to the weight of authority holding that property should be listed in bankruptcy schedules at fair-market value. But, there is limited support for the liquidation-value approach espoused by Bennington—namely the *Blanchard* and *Walsh* decisions cited above. In any event, West certainly could not reasonably have been expected to know that she should have used fair market, rather than liquidation, values in completing her Schedule B. *See Zitwer v. Kelly (In re Kelly)*, 135 B.R. 459, 462 (Bankr.S.D.N.Y.1992) ("The defense of reliance on counsel is not available when it is transparently plain that the advice is improper."). *See also In re Colvin*, 288 B.R. 477, 483 (Bankr.E.D.Mich.2003) ("The schedules made it 'transparently plain' to the debtors that they were required to disclose tax refunds even if their attorney did not inform them of that specific disclosure obligation." (quoting *Kelly*, 135 B.R. at 461)).

*See Keeney,* 227 F.3d at 686 ("[A] debtor is entitled to discharge if false information is the result of mistake or inadvertence"); *Mozeika v. Townsley (In re Townsley),* 195 B.R. 54, 65 (Bankr.E.D.Tex.1996) ("The denial of a discharge under § 727(a)(4)(A) cannot be imposed where the false statement was the result of a simple or honest mistake or inadvertence. Rather, to sustain an objection to discharge under this section, the debtor must have willfully made a false statement with intent to defraud his creditors.").

Moreover, the Trustee's contention that West acted with fraudulent intent in undervaluing the jewelry is based largely upon a comparison of her $2,000 estimate with the jewelry's original purchase price and its current retail value. But the $2,000 valuation contained in Schedule B should not be viewed in isolation. West disclosed in Schedule D (Creditors Holding Secured Claims) six claims totaling in excess of $30,000 and specifically noted that these claims were secured by jewelry. By making this disclosure, West put the Trustee and creditors on notice that she had purchased over $30,000 in jewelry before the Petition Date and this jewelry secured substantial claims against her estate. Had it been West's intent to conceal the fact that she owned a number of pieces of jewelry, these disclosures presumably would not have been made.

In sum, the evidence does not establish that the Debtor knowingly and fraudulently understated the value of the jewelry in her schedules. The Trustee therefore is not entitled to judgment under § 727(a)(4)(A) on his false oath claim.

### D. The Debtor's Alleged Concealment of the Sapphire Ring— § 727(a)(2)(B)

Alleging that West concealed and attempted to dispose of the Sapphire Ring after the Petition Date, the Trustee also seeks denial of the Debtor's discharge under § 727(a)(2)(B) of the Code. To establish a claim for denial of discharge under § 727(a)(2)(B), the Trustee must prove that the Debtor (1) transferred, removed, destroyed, mutilated, or concealed property of her bankruptcy estate, (2) with actual intent to hinder, delay, or defraud a creditor or an officer of the estate, (3) after the Petition Date. *Sowers,* 229 B.R. at 156. Intent to hinder, delay, or defraud must be actual rather than constructive. *McWilliams,* 284 F.3d at 790; *Sowers,* 229 B.R. at 157.

The evidence presented at trial established that after she had informed the Trustee that all of her jewelry had been turned over, West attempted to sell or trade the Sapphire Ring at James Free Jewelers. The Debtor's retention and attempted disposition of the Sapphire Ring came to the Trustee's attention by happenstance. During a visit to James Free Jewelers to obtain an appraisal of several of the pieces of jewelry previously turned over by West, Harker learned from Karaman that the Debtor had recently visited the store and attempted to sell the Sapphire Ring or trade it for a different piece of jewelry. West's attempt to sell or trade the Sapphire Ring—after advising the Trustee that she had turned over all of her jewelry—was corroborated by the testimony of Karaman and Ihle. Based on this evidence, the Court finds that after filing her Chapter 7 petition West concealed and attempted to dispose of an asset of the bankruptcy estate. The Trustee thus has established the first and third elements of his § 727(a)(2)(B) claim.

The Court next turns to the issue of whether the Debtor acted with intent to hinder, delay, or defraud the Trustee and/or her creditors. "Intent is the most difficult element of a § 727 violation to prove...." *Poolquip–McNeme, Inc. v.*

*Hubbard (In re Hubbard),* 96 B.R. 739, 741 (Bankr.W.D.Tex.1989).

> When ascertaining whether a violation of [§] 727(a)(2)(B) ... has occurred, the trier of fact is necessarily required to make a subjective inquiry into the debtor's state of mind. Such an inquiry normally requires explanatory testimony by the debtor and an assessment by the trier of fact of the debtor's demeanor and credibility.

*Sowers,* 229 B.R. at 159 (citing *First Tex. Sav. Ass'n Inc. v. Reed (In re Reed),* 700 F.2d 986 (5th Cir.1983)).

Having considered the Debtor's explanation for failing to turn over the Sapphire Ring, observed her demeanor, and assessed her credibility, the Court concludes that West acted with intent to hinder, delay, or defraud the Trustee and/or her creditors.[9] Although she was given ample opportunity to do so, West simply failed to offer a coherent or credible explanation for her failure to turn over the Sapphire Ring to the Trustee until January 2003—6 months after the filing of the Complaint in this adversary proceeding, more than 12 months after Harker learned of the Sapphire Ring's existence and instructed Conway to advise West to turn over the Sapphire Ring to the Trustee immediately, and nearly 19 months after the Petition Date. While West attempted to persuade the Court that her failure to turn over the Sapphire Ring was due to mistake or inadvertence, her explanation was unconvincing. Indeed, it was West's evasive and hopelessly irreconcilable testimony concerning her belated turnover of the Sapphire Ring and her dealings with James Free Jewelers that ultimately convinced the Court that she acted with the requisite intent to hinder, delay, or defraud the

Trustee and/or her creditors. At various times at trial and in pre-trial discovery proceedings West testified alternatively that she: (1) did not know that she had the Sapphire Ring at all; (2) did not become aware that she had the Sapphire Ring until Conway called her following his conversation with the Trustee; (3) did know that she had the Sapphire Ring, but did not turn it over because it lacked significant value; (4) had the Sapphire Ring and took it to James Free Jewelers to have it sized; and (5) had the Sapphire Ring, but never took it to James Free Jewelers. In short, this muddled and self-contradictory testimony led the Court to the conclusion that West was not telling the truth.

West's wrongful intent also was demonstrated by her course of dealing with the Trustee. On several occasions, West advised Harker that she had turned over *all* her jewelry. Yet, in each instance, after further prodding by the Trustee, additional jewelry surfaced. The Debtor's piecemeal turnover of her jewelry also suggests that she acted with intent to hinder, delay, or defraud the Trustee and/or her creditors.

The Court is not persuaded—as the Debtor's counsel argued—that West's failure to turn over the Sapphire Ring to the Trustee for nearly 19 months after the Petition Date (and only then after being prompted to do so by her counsel at Harker's urging) was attributable to memory lapses caused by chronic fatigue syndrome and depression rather than wrongful intent. The Debtor testified that she suffers from short-term memory loss and cognition problems resulting from her medical condition. McNamee testified that she has noticed a marked deterioration in her sis-

---

9. Because § 727(a)(2) is worded in the disjunctive, proof of intent to defraud is unnecessary. Proof of intent to hinder or delay creditors or the Chapter 7 trustee suffices.

*Beauchamp v. Hoose (In re Beauchamp),* 236 B.R. 727, 731–32 (9th Cir. BAP 1999); *Snell,* 240 B.R. at 730.

ter's short-term memory after she became ill. Although the Debtor designated two medical professionals—a psychiatrist and a psychologist—as expert witnesses, they did not testify at trial. Nevertheless, without receiving expert testimony, the Court may "draw reasonable conclusions regarding [the Debtor's] mental and emotional state." *Brightful v. Pa. Higher Educ. Assistance Agency (In re Brightful)*, 267 F.3d 324, 330 (3d Cir.2001). *See also Cline v. Ill. Student Loan Assistance Ass'n (In re Cline)*, 248 B.R. 347, 350 (8th Cir. BAP 2000) (explaining that "[t]here is no reason to view the trial court's findings [regarding the debtor's emotional state] as unreliable merely because no expert evidence was introduced"). Having assessed her trial testimony, the Court does not believe that West's actions can be explained by short-term memory deficiencies caused by her medical condition. At trial, West recalled the approximate dollar amount paid for each piece of jewelry that she owned on the Petition Date. She also explained that Bennington's instruction to list her jewelry at pawnshop value was based upon advice he allegedly received from George Ledford, Dayton's former standing Chapter 13 Trustee, whom she remembered by name (although she referred to Ledford as "Redford"). The Debtor therefore appeared to have selective recall—i.e., she seemed to have the capacity to remember specific facts and details when they supported her position, but experienced memory lapses when confronted by pointed questions from the Trustee's counsel. The Court has no doubt that West does in fact suffer from memory and cognition difficulties stemming from her medical condition. But the Court is not convinced that West's pattern of misconduct—spanning more than 18 months—was attributable to cognition problems and short-term memory loss. Rather, the Court concludes, based on its assessment of the Debtor's demeanor and credibility, that West's failure to turn over the Sapphire Ring to the Trustee was motivated by an intent to hinder, delay, or defraud the Trustee and/or her creditors.

### E. Alleged Transfer of Jewelry Prior to the Petition Date— § 727(a)(2)(A)

Having found that the Debtor's discharge must be denied under § 727(a)(2)(B) of the Code, the Court need not address the Trustee's contention that West's prepetition transfer of jewelry to McNamee and a "friend of a friend" constitutes a ground for denial of discharge under § 727(a)(2)(A). *See In re Krehl*, 86 F.3d 737, 744 (7th Cir.1996) ("Because we already have rejected [the debtor's] challenge to a denial of discharge under paragraph (a)(2)(B) [of § 727], and it is clear that the additional violation of paragraph (a)(3) provides only an alternative ground for denial of discharge, we need not consider whether [the debtor violated this provision]."); *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 250 (4th Cir.1994) ("A party objecting to discharge need prove only one of the grounds for [denial of discharge] under § 727(a) because the provisions of § 727(a) are phrased in the disjunctive. Proof of conduct satisfying any one of the sub-sections is enough to justify a denial of the debtor's request for a discharge."); *DeVoll*, 266 B.R. at 98 ("If any one ground for a denial of discharge is established, the Court does not need to decide the propriety of any of the other grounds.").

### IV. Conclusion

Having concluded that West concealed and attempted to sell or trade the Sapphire Ring with the intent to hinder, delay, or defraud the Trustee and/or her creditors, the Court holds that the Debtor's discharge must be denied pursuant to 11 U.S.C. § 727(a)(2)(B). A judgment deny-

ing the Debtor's discharge will be entered separately.

**IT IS SO ORDERED.**