In re Jay Nathan BRESSLER, and Elisa Lynn Bressler, Debtors.

Comerica Bank, Plaintiff,

v.

Jay Nathan Bressler, Defendant.

Bankruptcy No. 02–62754.
Adversary No. 03–4279.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

March 11, 2005.

Mark L. Menczer, Southfield, MI, for Jay Nathan Bressler, Elisa Lynn Bressler.

## OPINION GRANTING, IN PART, PLAINTIFF COMERICA BANK'S MOTION FOR PARTIAL SUMMARY JUDGMENT

THOMAS J. TUCKER, Bankruptcy Judge.

This matter is before the Court on "Plaintiff Comerica Bank's Motion for Partial Summary Judgment," on its First Amended Adversary Complaint against Debtor Jay Nathan Bressler ("Bressler"). The motion seeks summary judgment (1) denying Bressler's discharge under 11 U.S.C. §§ 727(a)(2), (a)(3), (a)(4), (a)(5) and (a)(7); (2) determining that any debt owed to Comerica Bank ("Comerica") by Bressler is nondischargeable under 11 U.S.C. §§ 523(a)(2), (a)(4), and (a)(6); and (3) granting a money judgment for Comerica on a portion of Bressler's alleged debt to Comerica. The Court held a hearing on the motion and took it under advisement.

The Court concludes that Comerica is entitled to summary judgment denying Bressler's discharge under §§ 727(a)(3) and (a)(5).[1] It is therefore unnecessary to determine whether a discharge should be denied under the other provisions of § 727(a), or whether any of Bressler's debt to Comerica should be excepted from discharge under § 523(a).

---

**1.** Comerica originally filed an adversary complaint against both joint Debtors in this Chapter 7 case—Jay Nathan Bressler and his wife, Elisa Lynn Bressler—objecting to their discharge and to the dischargeability of any debt owed to Comerica. Comerica later amended its complaint, seeking relief against only Jay Nathan Bressler. And on March 8, 2004, the Court entered a "Stipulated Order Dismissing Adversary Proceeding as To Elisa Lynn Bressler Only." Elisa Bressler received her bankruptcy discharge on March 10, 2004.

## I. Facts.

### A. Bressler's substantial pre-petition bank deposits.

The undisputed facts show that during each of the two years before his bankruptcy filing, Bressler received and deposited into his bank accounts substantial sums of money, including proceeds from a loan he obtained from Comerica. The following facts are established by evidence Comerica presented with its motion, and are not in dispute.

### 1. The Comerica loan and its proceeds.

About eight months before filing bankruptcy, on January 22, 2002, Bressler participated in making two applications for automobile loans from Comerica. First, he applied for a loan for himself. The stated purpose of this loan was to purchase, for Bressler's personal use, a specific, new 2002 Lexus SC430 hard top convertible from an automobile dealership named Lou's Car Gallery.[2] Bressler stated on the loan application, and represented to Comerica's loan officer, that he was the Vice President of Lou's Car Gallery, earning an annual salary of $350,000.[3] Bressler also represented on the loan application that he had $70,000 of additional annual income from "J G Electronics Internet Business."[4]

---

**2.** (*See* Appendix In Supp. of Comerica Bank's Mot. For Partial Summ. J. ("Appendix") at Ex. 1; Aff. of Kenneth S. Novack In Supp. of Pl. Comerica Bank's Mot. For Summ. J. ("Novack Aff.") at ¶¶ 7–13.)

**3.** (*See* Appendix at Ex. 1; Novack Aff. at ¶ 13.)

**4.** (*See* Appendix at Ex. 1.)

As to the second loan application, Bressler helped his father, Louis Bressler, who was the owner of Lou's Car Gallery, to prepare and submit an application to Comerica for an automobile loan to purchase, for personal use, a specific, new 2002 Lexus SC430 hard top convertible. This vehicle also was to be purchased from Lou's Car Gallery.[5]

Contrary to representations he made to Comerica when he submitted his own loan application, Bressler did not have the intent or ability to purchase the vehicle that was the subject of the application. That vehicle, in fact, had already been sold by a different, unrelated dealer, Lexus of Ann Arbor, to someone else—Eugene Gizzarelli.[6] And Bressler made other misrepresentations to Comerica on his loan application.[7]

On January 29, 2002, Bressler and his father closed on the two automobile loans from Comerica. They signed separate promissory notes and security agreements. Each loan and promissory note was for $54,000.[8] Comerica issued two checks, each in the amount of $54,000: one payable to "Jay Bressler and Lou's Car Gallery" (Check No. 488905342); and the other payable to "Louis Bressler and Lou's Car Gallery" (Check No. 488905341).[9]

There is no evidence in the record that Bressler or his father ever used the loan proceeds to purchase the vehicles that were the subject of their loan applications. Rather, on the day of the loan closing, January 29, 2002, the following occurred:

- Bressler and his father endorsed their respective loan checks and deposited them into a commercial checking account that Lou's Car Gallery had with Comerica;[10]

- Lou's Car Gallery issued a check in the amount of $59,498.12 to Bressler (Check No. 1130), drawn on its account with Comerica.[11]

- Bressler endorsed and deposited Check No. 1130 into a joint bank account, held at Comerica, in the name of "Jay Bressler or Elisa Bressler ITF Sydney Bressler" (Account No. 6816713363)(the "Joint Account"); and

---

5. (*See id.*)

6. (*See* Appendix at Ex. 8 (Certified State of Michigan Title History for VIN # JTHFN48Y520008481); Appendix at Ex. 7 (Tr. of 341 Hearing) p. 13 lns. 21–25 ("I didn't intend to put the car in may name.... I borrowed money for a loan, not to buy a car."); Appendix at Ex. 19 (Tr. of Dep. of Jay Bressler) p. 67 lns. 16–20 ("This car was never intended to go in my name and be my personal loan, no.").)

7. Contrary to the representation in his loan application, Bressler was never employed as Vice President of Lou's Car Gallery, and he did not earn an annual salary of $350,000 from Lou's Car Gallery. Rather, Bressler worked as an independent contractor for Lou's Car Gallery, and he testified in his deposition that he never earned more than $35,000 a year from Lou's Car Gallery. (*See* Appendix at Ex. 19 (Tr. of Dep. of Jay Bressler) p. 23 lns. 14–25, p. 24 lns. 1–16, p. 26 lns. 8–9.) Furthermore, Bressler's and his wife's joint income tax returns for the years 1999, 2000, and 2001 state that their total W–2 income, including income from wages, salaries, and tips, was $36,301; $8,342; and $11,225, respectively. The 2001 tax return shows no income earned from a business named J.G. Electronics Internet Business. This contradicts not only Bressler's loan application, but also his testimony at the § 341 hearing that he "grossed $70,000" from operating that business in 2001. (*See id.* at Ex. 7 (Tr. of 341 Hearing) p. 11 lns. 2–5.)

8. (*See* Appendix at Ex. 2 and Ex. 3.)

9. (*See* Appendix at Ex. 4.)

10. (*See id.*)

11. (*See* Appendix at Ex. 5; Novack Aff. at ¶ 33.)

- Bressler then wire-transferred $40,000 out of that Joint Account to the Mirage casino in Las Vegas, Nevada.[12]

### 2. Bressler's bank deposits in 2001.

In addition to Check No. 1130 from Lou's Car Gallery in the amount of $59,498.12, which Bressler deposited into the Joint Account at Comerica on January 29, 2002, Bressler received many other checks from Lou's Car Gallery. In the period between January 10, 2001 and September 10, 2001, Bressler received at least twenty-four checks from Lou's Car Gallery, totaling $434,752.25.[13]

### 3. Bressler's bank deposits in 2002.

The monthly statements for the Joint Account at Comerica for January 2002 through June 2002 show many large deposits, totaling $539,308.07.[14] This is in addition to the deposit of the $59,498.12 check from Lou's Car Gallery described above.

### B. Bressler's substantial pre-petition bank withdrawals and alleged gambling losses.

Between June 21, 2002 and July 19, 2002, i.e., two to three months before filing

bankruptcy, Bressler withdrew $313,588.87 from the Joint Account.[15] On September 30, 2002, Bressler and his wife filed a joint voluntary petition for relief under Chapter 7. On October 18, 2002, they filed Schedules A through J and a Statement of Financial Affairs. Their Schedule B states that on the petition date they had a total of $700 in two bank accounts at Bank One. Schedule B indicates that on the petition date the Bresslers had no other money in any "checking, savings, or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, or homestead associations, or credit unions, brokerage houses, or cooperatives." Finally, the Bresslers' Statement of Financial Affairs states that they had $700,000 in gambling losses in the years 2001 and 2002.[16]

### C. Bressler's failure to document, explain, or detail his losses.

Comerica served discovery requests on Bressler seeking information and documents explaining how he disposed of the funds he admitted to receiving pre-petition.[17] The discovery requests also sought

- May 2002: a deposit of $45,000 on May 13, 2002;
- June 2002: four deposits totaling $240,350.07 (deposits of $71,100 on June 17, 2002, $79,000 on June 18, 2002, $30,250.07 and $60,000 on June 25, 2002).

(Appendix at Ex. 13)

**12.** (See Appendix at Ex. 6 (Money Transfer Request), Ex. 13 (Check Account Detail), and Ex. 19 (Tr. of Dep. of Jay Bressler) at p. 91 lns. 21–23; Novack Aff. at ¶ 33.)

**13.** (See Appendix at Ex. 12; Aff. of John Baum at 2 ¶ 4 (Ex. D of Pl. Comerica Banks' Am. Br. In Supp. of Mot. For Partial Summ. J).)

**14.** Deposits were made as follows:
- January 2002: three deposits totaling $164,698 (deposits of $75,000 on January 23, 2002, $74,598 on January 29, 2002, and $15,100 on January 30, 2002);
- February 2002: a deposit of $9,725 on February 26, 2002;
- March 2002: a deposit of $32,735 on March 4, 2002;
- April 2002: a deposit of $46,800 on April 29, 2002;

**15.** (See Appendix at Ex. 13.)

**16.** (Statement of Financial Affairs at ¶ 8.)

**17.** (See Appendix at Ex. 9 ("Comerica Bank's Request for Production of Documents"); Appendix at Ex. 10 ("Comerica Bank's First Set of Interrogatories and Second Request For Production of Documents To Defendants"); Appendix at Ex. 19 (Tr. of the Dep. of Jay Bressler).)

"documentation for all of the Bresslers' alleged gambling winnings and losses for the past three (3) years." [18]

In response to Comerica's discovery requests, Bressler produced no documents to explain his disposition of any of the pre-petition assets. Specifically, Bressler has produced no documents regarding his disposition of (1) the $434,752.25 in checks he received from Lou's Gallery from January 10, 2001 through September 10, 2001; (2) the proceeds of the $59,498.12 check (Check No. 1130) he received from Lou's Car Gallery on January 29, 2002; or (3) the $313,588.87 he withdrew from the Joint Account at Comerica between June 21, 2002 and July 19, 2002. The only explanation Bressler has provided is the vague assertion that he gambled the money away or bought cars.[19] However, Bressler has provided no details regarding any gambling losses and no documentation to substantiate any gambling losses, let alone the $700,000 in pre-petition gambling losses claimed in his Statement of Financial Affairs. Nor has he provided any details or documentation regarding his alleged purchase of any cars.

Bressler also did not provide any details or documentation to explain why he received the checks totaling $434,752.25 from Lou's Car Gallery in 2001. In his deposition, when asked about these checks, Bressler stated that he did not recall the reason for any particular payment. Bressler stated as to all of the payments: "I bought and sold cars. I'm sure they were money from cars, coming back from loans from cars." [20] However, Bressler could not remember the particular cars concerning which the payments were made, nor did he have any documentation of any loans he had made for the purchase of any cars that could justify the alleged loan re-payments to him.

## II. Jurisdiction.

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and 157, and District Court Local Rule 83.50 (E.D. Mich.). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J).

## III. Discussion.

### A. Summary Judgment Standard.

Federal Civil Rule 56(c), made applicable to this adversary proceeding by Fed. R.Bankr.P. 7056, provides that a motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In *Cox v. Kentucky Department of Transportation*, 53 F.3d 146, 149–50 (6th Cir.1995), the Sixth Circuit explained now-familiar rules:

> The moving party has the initial burden of proving that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. To meet this burden, the moving party may rely on any of the evidentiary sources listed in Rule 56(c) or may merely rely upon the failure of the non-moving party to produce any evidence which would create a genuine dispute for the [trier of fact]. Essentially, a motion for summary judgment is a means by

---

18. (*See* Appendix at Ex. 9 ("Comerica Bank's Request for Production of Documents") p. 2 ¶ 5.)

19. (*See, e.g.*, Appendix at Ex. 19 (Tr. of Dep. of Jay Bressler) p. 91 lns. 21–25, p. 92 ln. 1, p. 176 lns. 5–13.)

20. (Appendix at Ex. 19 p. 175 lns. 23–24.)

which to challenge the opposing party to 'put up or shut up' on a critical issue.

If the moving party satisfies its burden, then the burden of going forward shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by [the trier of fact]. In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party. However, if the evidence is insufficient to reasonably support a ... verdict in favor of the nonmoving party, the motion for summary judgment will be granted. Thus, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff.

The Court concludes that Comerica has satisfied its summary judgment burden with regard to all of the elements of 11 U.S.C. §§ 727(a)(3) and (a)(5), and that Bressler has failed to produce even a scintilla of evidence to create a genuine issue of material fact on any of those elements.

## B. Section 727(a)(5).

■ Bankruptcy Code § 727(a)(5) provides:

The court shall grant the debtor a discharge, unless ... the debtor has failed to explain satisfactorily, before determination of denial of discharge under this

paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]

11 U.S.C. § 727(a)(5). In *Solomon v. Barman (In re Barman)*, 244 B.R. 896 (Bankr. E.D.Mich.2000), the court discussed the burdens of proof applicable under § 727(a)(5):

Section 727(a)(5) is broad enough to include any unexplained disappearance or shortage of assets. The initial burden is on the objecting party to introduce some evidence of the disappearance of substantial assets or of unusual transactions. The debtor must then satisfactorily explain what happened.

244 B.R. at 900 (citations omitted).

Here, it is undisputed that during the two years before he filed bankruptcy, Bressler received cash-equivalent assets totaling at least $494,250.37, and possibly as much as $807,839.24, consisting of: (1) the $434,752.25 in checks he received from Lou's Car Gallery between January 10, 2001 and September 10, 2001; (2) the $59,498.12 check he received from Lou's Car Gallery on January 29, 2002; and (3) the $313,588.87 he withdrew from the Joint Account at Comerica only 2–3 months before filing bankruptcy (between June 21, 2002 and July 19, 2002).[21] As of the September 29, 2002 petition date, the Bresslers claimed in their Schedule B to have only $700. Therefore, to meet his burden under § 727(a)(5), Bressler must satisfactorily explain, at a minimum, the loss of

---

**21.** Although the checks Bressler received in 2001 from Lou's Car Gallery were not directly deposited into the Joint Account that Bressler had at Comerica, which is the account from which he withdrew the $313,588.87 in 2002, it is possible that the source of some of the funds in that account was some or all of the $434,752.25 in proceeds from the checks Bressler received from Lou's Gallery in 2001. As there is no evidence in the record about what Bressler did with the $434,752.25, it is

unclear whether this amount was in addition to or part of the $313,588.87 Bressler withdrew from the Joint Account at Comerica in 2002. However, because Bressler claims to have lost $700,000 due to gambling in the years 2001 and 2002, it would appear that the $434,752.25 may be, at least in part, in addition to the $313,588.87. The Court does not need to resolve this question; it is not material to the outcome in this case.

between $494,250.37 and $807,839.24 in assets during the two years before he filed bankruptcy.

Bressler has failed to meet this burden. The only evidence in the record relating to the loss of these assets is Bressler's vague and unsubstantiated statements, repeated in his deposition, at the § 341 hearing, and in his Statement of Financial Affairs, that he lost about $700,000 from gambling in 2001 and 2002.[22] Bressler has not presented *any* details, documentation, or corroborating evidence to support this allegation.

Bressler argues that his failure to keep books and records of his gambling losses, standing alone, should not be sufficient to deny him a discharge under §§ 727(a)(3) or (a)(5). He argues that gamblers typically are not like business people or bankers, *i.e.*, the types of people who regularly keep books and records, and that gambling losses typically are not the type of activities for which books and records are kept. He argues further that a sworn statement by a debtor, such as in a Statement of Financial Affairs, that he lost significant assets gambling, is sufficient to avoid a judgment of nondischargeability under §§ 727(a)(3) and (a)(5) unless the opposing party can *disprove* the truth of the statement. Bressler argues that his vague, sworn statement alone is sufficient, without any further details or corroborating evidence, unless Comerica can show that he did *not* suffer the alleged gambling losses.

The Court disagrees. Standing alone, Bressler's bald assertion that he lost $700,000 in gambling would be insufficient evidence for a factfinder to reasonably find in favor of Bressler under § 727(a)(5) after a trial. "Courts have consistently held that unsubstantiated gambling losses are a basis for denial of the discharge under § 727(a)(5)." *Barman*, 244 B.R. at 901 (citing *Dolin v. Northern Petrochemical Co. (In re Dolin)*, 799 F.2d 251 (6th Cir. 1986) and other case law). In *Dolin v. Northern Petrochemical Co. (In re Dolin)*, 799 F.2d 251, 253 (6th Cir.1986), the Sixth Circuit held that the debtor's general, unsubstantiated statements that he spent over $500,000 in the three years before his bankruptcy to support his cocaine and gambling addictions was not a satisfactory explanation of the loss of those assets under §§ 727(a)(3) and (a)(5). In *Dolin*, the Court noted that the debtor could not substantiate to whom he made payments, the date of the payments, and "[t]here was no evidence that either [the debtor's] chemical dependency or his compulsive gambling interfered with his ability to keep records."

Similarly, the court in *Sicherman v. Murphy (In re Murphy)*, 244 B.R. 418 (Bankr.N.D.Ohio 2000), denied the debtor a discharge under § 727(a)(5). In that case, the debtor did not provide any documentation and could not provide any details of specific payments to support his allegation that he spent $54,000 on drinking and gambling after a divorce. The *Sicherman* court explained that § 727(a)(5) "is one of several subsections

---

**22.** Debtors' Statement of Financial Affairs states that Debtors had $700,000 in gambling losses in the years 2001 and 2002, without specifying whose gambling losses they were, as between Jay Bressler and Elisa Bressler. But when questioned at his deposition about the $434,000+ that he received from Lou's Car Gallery in 2001, Jay Bressler testified that *he* lost it gambling. (Appendix 19 (Tr. of Dep. of Jay Bressler) p. 176 lns. 5–25; *see also id.* at p. 91 lns. 21–25, p. 96 ln. 1 (where, in response to a question regarding $59,000 in proceeds he received, Jay Bressler stated that he either bought other cars or lost it gambling).) Jay Bressler also testified that he is a gambling addict. (*Id.* at p. 179 lns. 11–12.) There is no evidence in the record to indicate that Elisa Bressler ever lost any money gambling.

of section 727(a) which require a chapter 7 debtor to provide relevant details of financial transactions," and that it "impose[s] upon the debtor the obligation to cooperate in furnishing the trustee an appropriate history of his debts, assets and financial transactions." *Id.* at 420. The debtor in *Sicherman* "attempted to meet ['the burden of going forward with evidence to explain the loss of the $54,000'] with testimony that he drank and gambled the money away." *Id.* at 421. The court explained that this did not constitute a satisfactory explanation for purposes of § 727(a)(5):

> Although there appears to be no doubt that the Debtor did use or lose most of the $54,000 in gambling and drinking, his explanation as reflected by his testimony at trial was not satisfactory. His alleged inability to supply any details as to his drinking or gambling bouts except that the latter took place mostly in Las Vegas or St. Louis, is not satisfactorily explained by the anger, anxiety or depression he alleges prompted those bouts. He appeared to make little effort to recall the times, places, amounts or other details of his gambling trips. His attitude appeared to be that his general statements should just be accepted as sufficient and that he need not be bothered to supply the details. He supplied no documents or records of any kind to the Trustee that relate to the use and loss of the funds and could supply no dates or times during which he gambled or drank. His almost complete inability to recall any of those details is not explained by depression or anger.

*Id.*

Similarly, in this case, the Court concludes that Bressler's reliance on only a bare, general assertion that he lost $700,000 in gambling, without details or substantiation, is not a satisfactory explanation for the loss of his substantial prepetition assets. For this reason, Comerica

is entitled to summary judgment denying Bressler a discharge under § 727(a)(5).

## C. Section 727(a)(3).

■ Bankruptcy Code § 727(a)(3) provides:

> The court shall grant the debtor a discharge, unless … the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

11 U.S.C. § 727(a)(3). To carry its initial burden, a party seeking denial of a debtor's discharge under § 727(a)(3) must present evidence that shows:

> (1) either that the debtor failed to keep or preserve any recorded information, including books, documents, records and papers, or that the debtor or someone acting for him destroyed, mutilated, falsified, or concealed any recorded information including books, documents, records and papers; and (2) that as a result, it is impossible to ascertain the financial condition and material business transactions of the debtor.

*Barman,* 244 B.R. at 900 (citation omitted). Once the plaintiff has established that the debtor's records are inadequate, the burden shifts to the debtor to prove some justification for his failure to have adequate records. *Id.* at 900.

■ Here, Comerica has demonstrated that Bressler's financial records are inadequate. Bressler has produced no records to document the source or sources of his income or shed any light on his pre-petition transactions described above. And it is impossible on the record before the Court to substantiate Bressler's vague claims of how he disposed of very signifi-

cant pre-petition assets. Further, Bressler has made no attempt to justify his utter failure to maintain any records. These circumstances require summary judgment denying Bressler's discharge under § 727(a)(3).

## IV. Conclusion.

Having concluded that Bressler must be denied a discharge under §§ 727(a)(3) and (a)(5), the Court will grant, in part, Comerica's motion for partial summary judgment to this extent. In light of the Court's denial of Bressler's discharge on these grounds, it is unnecessary to address Comerica's claims that Bressler should be denied a discharge under §§ 727(a)(2), (a)(4), and (a)(7), or Comerica's claims to except its debt from discharge under §§ 523(a)(2), (a)(4), and (a)(6).[23] The Court will dismiss these other claims without prejudice. The Court will enter an order consistent with this opinion.

---

**23.** Because of this, it is also unnecessary to address Comerica's request for a summary judgment granting a money judgment for a portion of the debt allegedly owed by Bressler to Comerica. Because §§ 727(a)(3) and (a)(5) preclude discharge of *any* of Bressler's debts in his bankruptcy case, it is not necessary for this Court to quantify the amount of Bressler's debt to Comerica, as it might otherwise be in an action brought solely under § 523(a).