In re Bernard E. JOHNSON, and Nicole G. Johnson, Debtors.

Thomas R. Noland, Chapter 7 Trustee of the Estate of Bernard E. Johnson and Nicole G. Johnson, Plaintiff,

v.

Bernard E. Johnson, and Nicole G. Johnson, Defendants.

Bankruptcy No. 06–32802.
Adversary No. 07–3121.

United States Bankruptcy Court, S.D. Ohio, Western Division.

April 25, 2008.

Thomas R. Noland, Fifth Third Center, Dayton, OH, for Plaintiff.

William O. Cass, Jr., Kettering, OH, Richard A. Boucher, Dayton, OH, for Defendants.

## DECISION DENYING DEBTOR BERNARD E. JOHNSON'S DISCHARGE

LAWRENCE W. WALTER, Bankruptcy Judge.

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334, and the standing General Order of Reference in this District. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (J) and (O).

This matter is before the court on the Complaint to Deny Discharge filed by Plaintiff Thomas R. Noland, Chapter 7 Trustee of the Estate of Bernard E. Johnson and Nicole G. Johnson ("Trustee") [Adv. Doc. 1]. Answers were filed by Defendants Bernard E. Johnson ("Mr.Johnson") [Adv. Doc. 15] and Nicole G. Johnson ("Mrs.Johnson") [Adv. Doc. 16] (Mr. and Mrs. Johnson are from time to time referred to collectively as "Debtors"). The Trustee seeks to deny Debtors a discharge under 11 U.S.C. § 727(a)(2)(A) and (B), (a)(3), (a)(4), (a)(5) and (a)(6).

The matter proceeded to trial on November 21, 2007. The court has carefully considered and weighed the testimony of the witnesses, the exhibits admitted into evidence, and the closing argument briefs submitted by the parties. The following decision constitutes the court's findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052.

### FINDINGS OF FACT

From sometime in 1996 until June 29, 2005, Mrs. Johnson was employed by J.P. Morgan Chase & Co., formerly known as Bank One, N.A. ("Chase"), in the bank's private client services group located in Dayton, Ohio. Mrs. Johnson managed the accounts of many of Chase's more prosperous customers and assisted them with obtaining loans and lines of credit. Chase terminated Mrs. Johnson on June 25, 2005 after an internal investigation revealed that she had misused her position to embezzle nearly five million dollars ($5,000,000.00). Since sometime in 2001, she had been fraudulently using her clients' personal identifying information to establish phantom accounts and lines of credit which she would use to obtain funds for her own use. Most of these funds were deposited into the Debtors' joint checking account.

To recoup its loses, Chase filed suit in state court on January 26, 2006 against both Debtors as well as Serious Solutions, Inc. ("Serious Solutions") and Domsyd Properties, LLC ("Domsyd"), two Ohio entities owned and controlled by Mr. and/or Mrs. Johnson. Chase obtained a preliminary injunction ordering Debtors to transfer to Chase seven (7) parcels of real estate owned by Debtors or Domsyd as well as a Land Rover worth approximately $80,000.00. By entry on July 21, 2006, Debtors consented to a joint and several judgment against them for $1,950,000.00 plus interest.

On November 13, 2007, shortly before the trial of this matter, Mrs. Johnson pleaded guilty in federal district court to criminal charges of bank fraud, money laundering, and false statements on a tax

return. As part of her plea agreement, Mrs. Johnson agreed, among other things, that she would cooperate with the Trustee and would file an itemization of each transaction in which she spent, transferred, conveyed, used, or invested the embezzled funds. She also agreed to waive her rights to a bankruptcy discharge. At trial in the instant adversary proceeding, Mrs. Johnson and the Trustee agreed to submit to the court a proposed agreed order reflecting Mrs. Johnson's waiver of discharge. Because the proposed agreed order was not forthcoming, the court entered its own order to the same effect on February 6, 2007. Mrs. Johnson did testify during the trial in bankruptcy court but her discharge was no longer at issue. The trial pertained only to the discharge of Mr. Johnson and this decision will likewise focus on the Trustee's claims against him.

While Mr. Johnson also benefited from the ill-gotten funds from Chase, he professes ignorance of his wife's malfeasance during the time it was perpetrated. According to his testimony, Mr. Johnson was duped by Mrs. Johnson into believing Chase had granted them a joint $1,000,000 line of credit for the primary purpose of enabling Mr. Johnson to purchase, rehabilitate, and sell real estate. Both Debtors claim that Mr. Johnson signed a loan document provided to him by Mrs. Johnson sometime in 2001, but the document was not produced during the pendency of this action.

Mr. Johnson graduated in 1983 from a Dayton area community college with a technical degree. As an electronics technician, he held various jobs in which he installed, serviced, and maintained computer hardware, automatic teller machines, and computer networks. In early 2000, with the help of a $100,000.00 loan from his friend, Hugh Douglas, he started his own computer repair business under the name Serious Solutions. The venture was not profitable and gradually ceased business over two or three years.

In 2001, the year Mrs. Johnson began her fraudulent scheme at Chase, her salary was between $50,000.00 and $60,000.00. Mr. Johnson's income, although not precisely quantified at trial, was considerably less. However, with the availability of the embezzled money, the Johnsons' spending soared. During the period of 2002 through 2005, the Johnsons, either individually or through Domsyd, acquired twelve parcels of real estate costing approximately $1,500,000.00 in the aggregate.

In addition to the real estate purchases and the costs attendant to rehabilitating and maintaining the properties, Mr. and Mrs. Johnson also used the funds for some living expenses and to support a more lavish lifestyle. Their financial records reveal significant expenditures for high-end clothing, jewelry, and furniture. Mrs. Johnson spent staggering amounts on jewelry and clothing. The couple also enjoyed numerous expensive vacations in Las Vegas and to the Caribbean. Mr. Johnson engaged in periodic recreational gambling on the internet and at casinos, including betting on boxing matches in Las Vegas. Mr. Johnson further engaged in cash transactions of more than $530,000.00 during these years for which he kept no specific records. The Johnsons also repaid debts to friends or family members, including a wire transfer of $50,000.00 to Hugh Douglas on December 21, 2001. Substantial amounts embezzled by Mrs. Johnson were not expended by the couple but were recycled back to Chase as Mrs. Johnson partially repaid Chase using funds from new phantom lines of credit to make payments on earlier phantom lines of credit.

On September 29, 2006 (the "Petition Date"), Debtors filed their joint chapter 7 bankruptcy case, number 06–32802 ("Estate Case"). According to their bankrupt-

cy schedules, Debtors' assets total $164,570.00 consisting of their residence valued at $130,000.00 and personal property valued at $34,570.00. They list liabilities of $2,211,300.00 consisting principally of the Chase judgment and credit card debts. Among the larger credit card debts are $60,000.00 owed to MBNA America, $15,000.00 owed to Keybank, and $18,000.00 owed to Saks Fifth Avenue. Schedule I indicates that Debtors have aggregate monthly income of $40.00. Schedule J shows monthly expenses of $6,985.00. Other assets listed on Schedule B include $600.00 in cash; $10.00 in a First Day Financial Credit Union account; $10.00 in a Wright Patterson Credit Union account[1]; $3,000.00 in household goods and furnishings, $1,000.00 worth of furs and jewelry; a pension plan of $21,000.00; a 1999 Oldsmobile Aurora valued at $3,950.00, and a 2000 Chevrolet Silverado valued at $1,000.00. Debtors' statement of financial affairs discloses joint annual income from employment of $102,019.00 for 2004 and $31,531.00 for 2005; tax refunds of $8,659.00 for 2004 and $7,256.00 for 2005; and rental income of $3,112.00 for 2004 and $1,440.00 for 2005. Debtors' statement of financial affairs also lists the transfer within the two (2) years preceding the filing of the petition of a 1976 Buick Riviera from Mr. Johnson to his father, William Perrin. The Buick Riviera was not actually transferred and the Debtors intended that it be scheduled as an asset, but they failed to correct the error initially or by subsequent amendment. Finally, four (4) parcels of real property are shown as having been foreclosed upon by Chase but they were actually transferred to Chase as part of the state court proceedings.

Debtors failed to disclose some assets, liabilities, and transactions in their initial schedules and statements. Among the nondisclosures were the transfer of a parcel of real estate to Mr. Johnson's father shortly before the Petition Date; expensive Ello Italian furniture (with an approximate value of $10,000.00–$15,000.00) held in a storage unit; substantial debts owed to friends and relatives as well as recent payments on those debts; and receipt of a federal tax refund check in the amount of $1,217.57 shortly after the Petition Date.

On December 6, 2006, Chase commenced an adversary proceeding against Debtors, case number 06–3488, seeking to have Debtors' debt to Chase declared non-dischargeable under 11 U.S.C. § 523 ("Chase Adversary"). On May 22, 2007, the Trustee initiated the instant adversary proceeding alleging that Debtors' discharge should be denied for the following reasons: (i) they concealed and or transferred property with intent to delay, hinder or defraud the Trustee and creditors; (ii) they destroyed or failed to maintain records from which their financial condition could be ascertained; (iii) they made materially false statements in their petition, schedules, statements of affairs and during their depositions by failing to disclose certain assets, grossly undervaluing others, and failing to disclose the conveyance of certain property; (iv) they failed to explain the loss of close to $2,000,000.00 in assets; and (v) they failed to obey court orders.

Beginning with the first meeting of creditors held on November 15, 2006 pursuant to 11 U.S.C. § 341, and continuing thereafter through the Chase Adversary and the instant adversary proceeding, Mr.

---

1. The Trustee repeatedly questioned the accuracy of the Debtors' schedules and discovered, among other things, a tax refund check that they had partially deposited in their First Day Financial Credit Union account prior to

the Petition Date. On May 11, 2007, the Debtors finally filed an amendment to Schedule B revising the First Day Financial account balance to $4771.06 and the Wright Patterson account to $5.00.

Johnson and his wife were extremely uncooperative in producing documents and information requested by the Trustee and Chase. As a consequence, on December 21, 2006, this court entered an order in the Estate Case to compel Debtors to attend a rescheduled § 341 meeting of creditors and a Rule 2004 examination that had been previously cancelled due to their lack of responsiveness. The order also required them to produce certain documents requested by the Trustee and Chase. On March 28, 2007 the court entered an order holding Debtors in contempt and compelling them once again to produce the documents requested by the Trustee and Chase's counsel, to submit to their Rule 2004 examination, and to attend the rescheduled meeting of creditors (the "Contempt Order") [Chase Adv. Doc. 28].

On May 22, 2007, The Trustee filed a Memorandum in Support of a default motion filed by Chase in which the Trustee reiterated that Debtors had intentionally failed to comply with the Contempt Order. A hearing on Chase's default motion was held on August 2, 2007. Debtors failed to appear. On August 9, 2007, this court entered an order holding Chase's default motion in abeyance pending the resolution of the Trustee's case and allowing for continued discovery. [Chase Adv. Doc. 41]. The court also noted that the factual allegations and issues raised in Chase's default motion could be addressed by and form a basis for relief as part of the Trustee's case. On October 23, 2007, the Trustee filed a Motion for Sanctions based on Debtors' failure to cooperate with the discovery process and to comply with the court's prior orders. [Trustee Adv. Doc. 39]. The court deferred consideration of the issues raised in the Trustee's motion until the trial.

At trial, Mr. Johnson's general explanations as to his prepetition expenditure of funds to purchase, rehabilitate, and maintain real estate, or to pay employees, or to gamble were for the most part without verifying documentation. He testified that he kept no financial records such as rent rolls, collections, deposits, payments to contractors or to taxing authorities. He did not produce any financial records tracing the proceeds from the sale of four (4) parcels of real property. Mr. Johnson declared that while he had maintained records for his businesses on QuickBooks, he disposed of them "because he did not need them anymore."[2] He was unable to recall details of most expenditures and could not recall the names of any of his employees whom he paid in cash to rehabilitate and maintain his real estate holdings. His primary explanation for his lack of knowledge about his finances, other than a faulty memory, was that Mrs. Johnson generally handled the family finances.

### CONCLUSIONS OF LAW

One of the foundational principles of a Chapter 7 bankruptcy case is to grant the honest debtor a discharge of his or her prepetition debts. *Harker v. West (In re West)*, 328 B.R. 736, 747 (Bankr. S.D.Ohio 2004). However, consistent with the Code, bankruptcy protection and a discharge may be denied to a debtor who is less than honest. *Id.* Consequently, Congress enacted § 727(a), enumerating separate grounds for denial of the discharge, to ensure that those who seek shelter under the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 725 (6th Cir. BAP 1999) ("Neither the trustee nor the creditors should be required to engage in a

---

**2.** As late as August 28, 2007, the date of his deposition, Mr. Johnson stated that he still had QuickBooks on his computer with the business records of Domsyd.

laborious tug-of-war to drag the simple truth into the glare of daylight."). In fact, the successful functioning of the Bankruptcy Code hinges upon the bankrupt's veracity and willingness to cooperate with the bankruptcy trustee and make a full disclosure. *Id.* at 725–26. Thus, when the truth is not forthcoming from a debtor, the discharge should be denied.

In this case, the Trustee claims that several bases in § 727(a) warrant denial of the Mr. Johnson's discharge. The Trustee's arguments are rooted in allegations that Mr. Johnson: 1) concealed or destroyed financial statements and other records to which the Trustee was entitled; 2) made false statements in the Debtors' schedules and otherwise by failing to disclose significant assets, debts and property transfers; 3) failed to adequately explain the dissipation of assets following Mrs. Johnson's embezzlement of funds from her employer; 4) failed to obey court orders requiring the Debtors to turn over documents; and 5) intentionally transferred or removed property of the estate that should have been turned over to the Trustee. As previously noted, Mrs. Johnson, in accordance with the terms of her criminal plea agreement, agreed to a waiver of her discharge pursuant to § 727 and the court has entered an order to that effect. Accordingly, the sole issue decided herein is whether a bankruptcy discharge should likewise be denied to her spouse, Mr. Johnson.

 As the Plaintiff, the Trustee bears the burden of proving that one of his claimed bases for denial of the Debtor's discharge exists. See Fed. R. Bankr.P. 4005. Furthermore, the Trustee must establish his grounds for denial of the discharge by a preponderance of the evidence. *West,* 328 B.R. at 748. Because a total bar to discharge is considered an extreme penalty, the § 727(a) exceptions to discharge are to be construed liberally in favor of the Debtor. *Id.*

### A. *Section 727(a)(3): Failure to Preserve Records*

 Pursuant to 11 U.S.C. § 727(a)(3), a bankruptcy discharge should be denied to a debtor who:

> ... has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

11 U.S.C.A. § 727(a)(3). The purpose of this provision is to require a debtor to produce sufficient records so that creditors are not required to risk the concealment of assets under the guise of chaotic or incomplete records. *Wazeter v. Michigan National Bank (In re Wazeter),* 209 B.R. 222, 228 (W.D.Mich.1997). This provision does not require a debtor to provide perfect or even complete records. *CM Temporary Services, Inc. v. Bailey (In re Bailey),* 375 B.R. 410, 415 (Bankr.S.D.Ohio 2007). Instead, a debtor is to provide the trustee and creditors " 'with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present.' " *Turoczy v. Strbac (In re Strbac),* 235 B.R. 880, 882 (6th Cir.BAP1999) (further citations omitted). *Bergeron v. Ross (In re Ross),* 367 B.R. 577, (Bankr.W.D.Ky.2007) ("The law does not require impeccable bookkeeping or extravagant accounting measures, but it does require at least a fundamental undertaking to maintain proper records.") Fraudulent intent is not an element under § 727(a)(3). *Ross,* 367 B.R. at 581.

██ The party seeking denial of the discharge, in this case the Trustee, bears the burden of establishing a *prima facie* case showing Mr. Johnson failed to keep adequate records. *Strbac*, 235 B.R. at 883; *Trustee v. Winters (In re Winters)*, 2008 WL 202774, at *3 (Bankr.N.D.Ohio Jan.22, 2008). The adequacy of a debtor's records is determined on a case by case basis taking into consideration a debtor's "occupation, financial structure, education, experience, sophistication and any other circumstances that should be considered in the interest of justice." *Strbac*, 235 B.R. at 882 (further citations omitted). If the Trustee's *prima facie* case is established, the burden shifts to Mr. Johnson to provide a reason for the lack of record-keeping. *Id.* at 883.

While Mr. Johnson is not an accountant or a financial professional, it is clear from his testimony that he has a reasonable grasp of practical business and financial matters. He created and managed his own repair and consulting business (Serious Solutions). He also operated an enterprise (Domsyd) within which he purchased real estate out of foreclosure, supervised the rehabilitation of the real estate, leased some premises, and sold others. From these business ventures, he acquired a working understanding of lines of credit, mortgages, leases, and real estate transactions. Notwithstanding this practical knowledge and business activity, he produced to the Trustee very little in the way of financial records other than checking account statements. He did keep some business records on his computer with Quick Books software from 2001 until sometime in 2005 when his wife's embezzlement was discovered. During a deposition in August of 2007, Mr. Johnson testified that he still had the program and records on his computer, but he failed to turn those records over to the Trustee and testified at trial that he had disposed of the records at some indeterminate time.

Mr. Johnson also gambled fairly regularly, testified that he once kept $100,000.00 in cash at his home (now gone), and claimed to have paid thousands of dollars in cash to construction employees. However, he kept no records whatsoever of these transactions and could not remember the names of any of his employees when questioned at trial. More than $530,000.00 in cash passed through his hands between 2001 and 2005 for which he was only able to provide vague explanation and no documentation. The following excerpt from the trial transcript illustrates this point:

THE TRUSTEE: This is Trial Exhibit No. 92 for identification. In that last spread sheet we just saw, this is an extrapolation of the items you wrote to cash out of that account. Now we've already hit the $20,000.00 check. Now, these are all cash transactions, not even written to your name, just to cash. And they total $530,781.23. Can you tell us what you spent that money for?

MR. JOHNSON: Not all of them I couldn't tell you but the majority of them was for expenditures for the properties, real estate taxes. Tait Road was a lot, it was in Kettering in a nice neighborhood so the taxes was a killer there. But like I said, most of all my expenditures were for properties. Now, granted of the money that I thought what I had gotten a loan for was, yeah, some of it was spent personally.

THE TRUSTEE: When you got the real estate tax bill, how did you pay it?

MR. JOHNSON: What do you mean, how did we pay it?

THE TRUSTEE: Did you pay it by check?

MR. JOHNSON: Yeah, or sometime I'd get cash, I may pay it by certified check or some of that nature.

THE TRUSTEE: What account would you pay that out of?

MR. JOHNSON: I can't recall.

THE TRUSTEE: FD68 for identification on Trial Exhibit 92, that's a $21,600.00 check. Do you recall what that was for, cashier's check?

MR. JOHNSON: No, sir. That was in '02.

THE TRUSTEE: That was before you bought Valerie Arms which was your first property.

MR. JOHNSON: No, I don't recall.

THE TRUSTEE: Here's another one made out to you for $40,508.00, 5–17–02.

MR. JOHNSON: This is the one you just asked me about?

THE TRUSTEE: No, this is a different one, this is FD78 for identification. FD68 was the $21,600.00.

MR. JOHNSON: No, I mean earlier you asked me about the forty thousand much earlier.

THE TRUSTEE: Did you have any idea what that was for?

MR. JOHNSON: No.

THE TRUSTEE: We see quite a number of checks for ten thousand dollars made out to cash by you.

MR. JOHNSON: Yes, correct.

THE TRUSTEE: Was there any reason you made them ten thousand dollars instead of ten thousand two hundred dollars?

MR. JOHNSON: No specific reason. Usually, like I said, I had a lot of jobs where guys would be five thousand here, forty-five hundred dollars here or fifty five hundred dollars there from these guys. Like I said, these guys were just, you know, guys that worked in construction, they would do a lot of my work after hours or something so they wanted

cash and that's mostly why I had a lot of cash transactions.

THE TRUSTEE: You testified earlier in one of your depositions that you were aware of the bank regulations that they had to report cash transactions over ten thousand dollars, is that correct?

MR. JOHNSON: I don't know, I can't recall if I said I was aware.

THE TRUSTEE: Were you aware of that restriction?

MR. JOHNSON: Yeah, I'm aware of it.

THE TRUSTEE: Here's one for $14,200.00 in cash. That was September 30, 2003. It's a Bates Number 899. Do you recall what that was for?

MR. JOHNSON: No, sir.

THE TRUSTEE: So of these totals of $530,781.23, can you tell us in specific any one person that was paid with this?

MR. JOHNSON: No, not off the top of my head, I can't tell you one person.

Mr. Johnson's primary explanation for his failure to account for his expenditures and financial transactions was that Mrs. Johnson handled the family finances. To an extent, that is plausible and it is likely that Mr. Johnson was not intimately familiar with all of Mrs. Johnson's expenditures and that he was not primarily responsible for maintaining the checkbook for their joint checking account. However, it is unreasonable, given Mr. Johnson's business activities and significant expenditures, that he would fail to at least maintain detailed records of his real estate transactions and his gambling winnings and losses.[3] Also, he must have been cognizant of the extraordinary increase in the Debtors' spending during the years in question, including the acquisition of such extravagant items as a an $80,000.00 Land Rover (without a lien), a men's leather suit costing

---

**3.** Mr. Johnson testified that he did not keep records of his gambling winnings and losses, but did report winnings on his tax returns by "estimating" the amounts.

$3,300.00 (which has disappeared without explanation), twelve parcels of real estate (several without mortgages), and luxurious vacation trips. Given this dramatic increase in expenditures without a corresponding increase in income, Mr. Johnson, regardless of his knowledge or lack of knowledge of the true source of the extra funds, should have had a heightened awareness of the necessity to account for income and expenditures. Certainly, at the time he became aware of Mrs. Johnson's defalcations, he should have preserved any records in existence, if not out of a sense of responsibility and grave concern, then at least to avoid the appearance of complicity. On the contrary, however, he "got rid of" the Quick Book records and, in concert with Mrs. Johnson, he consistently resisted the efforts of the Trustee and Chase to obtain information and documents.

In the context of Mr. Johnson's extravagant lifestyle, one completely incommensurate with his income, and his business activities, particularly those relating to buying, renting, and selling real estate, his failure to keep and preserve records is fatal to his discharge. It is impossible to track his financial dealings or account for missing funds with any degree of certainty or accuracy. This conclusion is further buttressed by Mr. Johnson's lack of credibility at trial, his cavalier attitude with respect to his inability to account for thousands of dollars in expenditures, and his egregious lack of cooperation throughout the discovery process.

**B. *Section 727(a)(5): Failure to Adequately Explain Dissipation of Assets***

■■■ Another basis for denial of a discharge is the Debtor's failure to "explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C.

§ 727(a)(5). Much of the court's discussion of Mr. Johnson's failure to maintain financial records is equally relevant here. Like § 727(a)(3), this provision requires the chapter 7 debtor to provide relevant details of assets held and financial transactions. This section is broad enough to include any unexplained disappearance or shortage of assets. *Comerica Bank v. Bressler (In re Bressler)*, 321 B.R. 412, 417 (Bankr.E.D.Mich.2005).

■■■ The initial burden is on the Trustee to introduce some evidence of the disappearance of substantial and identifiable assets that would otherwise be available to creditors or of unusual transactions at a time not too far removed from the bankruptcy filing date. *Id.; Strzesynski v. Devaul (In re Devaul)*, 318 B.R. 824, 839 (Bankr.N.D.Ohio 2004). The debtor must then satisfactorily explain what happened. *Bressler*, 321 B.R. at 417; *Devaul*, 318 B.R. at 839. The debtor's explanation "must be reasonable and credible so as to satisfy the court that the creditors have no cause to wonder where the assets went." *Devaul*, 318 B.R. at 839 (further citations omitted).

Often, the lack of corroborating evidence, through documentation or otherwise, will be relevant to the credibility of the debtor's explanation for the loss of assets. *Id.* at 840. *See also Bressler*, 321 B.R. at 418–19. For example, vague and indefinite explanations of losses such as "monies were spent" have been found unacceptable without documentation. *Schilling v. O'Bryan (In re O'Bryan)*, 246 B.R. 271, 280 (Bankr.W.D.Ky.1999). Furthermore, uncorroborated testimony from a debtor that he gambled away the assets or used them to pay for illegal substances has been found to be a inadequate explanation when the debtor had no substantiating documentation and could not explain the details of the actual expenditures such as

when and to whom they were made. *See Dolin v. Northern Petrochemical Co. (In re Dolin),* 799 F.2d 251, 253 (6th Cir.1986) (vague explanation that debtor spent $500,000.00 in three years to gamble and support his drug habit was not an adequate explanation); *Sicherman v. Murphy (In re Murphy),* 244 B.R. 418, 421 (Bankr. N.D.Ohio 2000) (debtor's explanation inadequate when he could provide no details or documentation as to the loss of $54,000.00 due to alleged gambling and drinking); *Solomon v. Barman (In re Barman),* 244 B.R. 896 (Bankr.E.D.Mich.2000) (unexplained loss of $131,000.00 in alleged gambling losses with no attempt at substantiating the losses with documentation or otherwise warranted denial of discharge).

As already discussed in the context of § 727(a)(3), even if Mrs. Johnson's expenditures are not considered, Mr. Johnson personally expended or transferred many thousands of dollars in the few years prior to filing bankruptcy for which he can provide no precise explanation and no documentation. While much of his testimony is inconclusive and sometimes confusing, it is ultimately clear that neither the Trustee nor this court can be certain of what actually happened to all that money. In the few instances where records are available, Mr. Johnson is generally unable to provide a satisfactory explanation. The trial transcript excerpts quoted above are illustrative of this as are the following excerpts from Mr. Johnson's testimony:

THE TRUSTEE: This is Plaintiff's Exhibit 25, Part 1, exhibit. This shows the $650,000.00 transfer into your account on December 10, 2001. And as of January 31 st, let's see, by January 31st of '02, I misspoke, that account balance was down to $233,821.00, is that correct?

MR. JOHNSON: That's what it says there.

THE TRUSTEE: I should have said within six months. I'm sorry. So by August 1 st of '02, that balance was down to $99,079.99, is that correct?

MR. JOHNSON: Yeah, that's what it says there.

THE TRUSTEE: And you can't recall where that money went?

MR. JOHNSON: Well, I know it went on properties. I can't recall which ones I bought at that time.

THE TRUSTEE: Well, you recall we've gone through this earlier, you didn't purchase your first property until May of 2002. This is prior to that. This is through August of 2001 or 2002.

* * *

THE TRUSTEE: Just an example, we've got a check withdrawal, $12,000.00, $11,090.00, $10,000.00. These are your cash transactions that occurred before you purchased Valerie Arms. I don't see any transfer to the 8282 account. These are just withdrawals.

MR. JOHNSON: No, it was on the other ones. It was on the other sheet. Those are checks, as a matter of fact. No, I don't know where they went to. I can't recall right at this time.

THE TRUSTEE: Trial Exhibit No. 35 for identification. Once again this is an excerpt from one of your transcripts that are plaintiff's exhibits, I believe they're 7 through 11. This is basically saying, "Any business records of any sort?" Do you see that question?

MR. JOHNSON: Yes.

THE TRUSTEE: Your answer, "Not other than your statements, your checks, your account, your checking account." So there are no other business records, is that correct, other than those?

MR. JOHNSON: Other than, you know, the deeds on properties, you know, so forth, payments of when you're making

payments like if you have the DP & L or lights or gas service.

THE TRUSTEE: Mr. Beyer was asking you this question I believe, "And you didn't keep any notes when you were running around looking at properties?" And do you see your answer there? It says, "I had my notes, the list, the sheriff's sale list."

MR. JOHNSON: That's correct.

THE TRUSTEE: And but you didn't keep those records, is that correct?

MR. JOHNSON: No.

THE TRUSTEE: Keep any gambling records?

MR. JOHNSON: No.

* * *

THE TRUSTEE: This is Plaintiff's Exhibit 34, Part 2, currency transaction report by casinos. Did you fill that out?

MR. JOHNSON: Nope.

THE TRUSTEE: You never got any kind of report on this transaction?

MR. JOHNSON: No, sir.

THE TRUSTEE: You cashed out $11,000.00 on this transaction. Do you see that?

MR. JOHNSON: That's what it says but I have no knowledge of that, sir.

THE TRUSTEE: You don't recall that?

MR. JOHNSON: No.

With considerable effort, one can attempt to correlate the embezzled funds received by the Debtors with the specific expenditures and assets acquired and then track the disposition of those assets. Certainly, one can account for real estate purchases and credit card purchases of clothing and jewelry to some extent. Beyond that, it is impossible to tell what happened to massive sums of money or to expensive items purchased. Mrs. Johnson testified that many of her possessions were sold at garage sales, but of course there are no records of these cash transactions. Mr. Johnson has no idea what happened to his $3,300.00 leather suit, how much he lost gambling, or how much he spent to rehabilitate houses. Not only was Mr. Johnson unhelpful in providing information and documentation to the Trustee, but many of his responses were evasive and even contemptuous. Again, an excerpt from the trial transcript best illustrates this, albeit without the benefit of facial expression, voice inflexion, and general demeanor:

THE TRUSTEE: Now, you paid back MGM Grand almost $10,500.00 after the state court law suit was instituted against you, is that correct?

MR. JOHNSON: That possibly may be true, yes.

THE TRUSTEE: What other accounts did you have in Las Vegas? Did you gamble at Caesar's?

MR. JOHNSON: Yeah. I didn't have any accounts there.

THE TRUSTEE: Did you gamble at New York New York?

MR. JOHNSON: Yes.

THE TRUSTEE: Where else did you gamble?

MR. JOHNSON: I think that might have been about it to be honest with you.

THE TRUSTEE: You made trips to Las Vegas 2001, 2002, 2003, 2004 and 2005.

MR. JOHNSON: I can't remember. I made several trips there, went to various computer shows.

THE TRUSTEE: Actually you went to see a lot of prize fights, didn't you?

MR. JOHNSON: I got comped a lot of prize fights.

THE TRUSTEE: Any other type of —— did you ever take anybody else out there besides your wife?

MR. JOHNSON: Say what?

THE TRUSTEE: Did you ever take anybody else out on your trips besides your wife?

MR. JOHNSON: Yeah, I took some friends with me.

THE TRUSTEE: How often would you gamble on the Internet?

MR. JOHNSON: Not often.

THE TRUSTEE: You realize that there were some statements that we were showing that you could buy segments over the Internet on gambling sessions? Do you remember how many gambling sessions you bought?

MR. JOHNSON: Say what?

THE TRUSTEE: When you went on the Internet to do gambling, you got charged for that time on the Internet. Do you recall that?

MR. JOHNSON: No.

THE TRUSTEE: How much money have you lost in gambling from 2000 through 2005?

MR. JOHNSON: I don't know.

THE TRUSTEE: Hundreds of thousands?

MR. JOHNSON: No.

THE TRUSTEE: More?

MR. JOHNSON: No, very much less.

THE TRUSTEE: Why would you keep as much as a hundred thousand dollars in cash in your safe?

MR. JOHNSON: Like I said, since I can remember I've never kept a lot of money in the bank. I was just taught from my parents and my grandparents that we never really kept a lot of money in the bank, we kept it at — our bank was at home. That was just always the way I was raised.

THE TRUSTEE: I'm looking back at Trial Exhibit 92 which is a summary of the cash transactions you did out of the 8282 account. So you're saying, are any of these cash transactions gambling?

MR. JOHNSON: I don't know for sure.

THE TRUSTEE: Would any one be that you could recall?

MR. JOHNSON: Would any one be what?

THE TRUSTEE: Any one of these events be a gambling transaction?

MR. JOHNSON: Not that I can recall, no.

THE TRUSTEE: So you spent $530,781.23 and you can't recall that any of these involved gambling?

MR. JOHNSON: Nope, sure can't. It possibly could but I can't recall for sure.

* * *

THE TRUSTEE: This is Trial Exhibit 60 which is, once again, your deposition testimony. "What's the highest amount you owed MGM Grand? No more than fifteen thousand." That's an incorrect statement, you owed them twenty thousand, we just showed that, didn't we.

MR. JOHNSON: Yeah.

Not only did Mr. Johnson fail to adequately explain the dissipation of his assets by means of reference to basic business and gambling records, but he resisted turnover of the few records he did have and he did not seriously attempt to provide an explanation at trial. A highly condensed but nevertheless accurate summary of his entire testimony in this regard is that he lavishly indulged himself for several years to the extent of several hundred thousand dollars, the source of which he never questioned, kept few records of expenditures or transactions, cannot remember much about what he did with the money, and really does not care. This pattern of conduct falls far below the "reasonable and credible" explanation sufficient "to satisfy the court that the creditors have no cause to wonder where the assets went." *Devaul*, 318 B.R. at 839. Accordingly, Mr. Johnson is not entitled to a discharge.

## C. Section 727(a)(4): False Statements Made Under Oath

It is of utmost importance in bankruptcy that the information which a debtor provides in his petition, schedules and statement of financial affairs be "accurate, thorough, and reliable." *Kaler v. McLaren (In re McLaren)*, 236 B.R. 882, 894 (Bankr.D.N.D.1999). Consequently, the Bankruptcy Code contains a separate basis for denial of a discharge when a debtor knowingly and fraudulently makes false statements under oath in connection with his bankruptcy case. See 11 U.S.C. § 727(a)(4)(A).[4] In this case, the Trustee asserts that denial of Mr. Johnson's discharge is appropriate under this provision because of the numerous false statements given by Mr. Johnson in his schedules and statement of financial affairs and while testifying at the meeting of creditors and depositions.

To prevail, the Trustee carries the burden of proving, by a preponderance of the evidence, that: 1) the debtor made a statement while under oath; 2) the statement was false; 3) the statement related materially to the bankruptcy case; 4) the debtor knew the statement was false; and 5) the debtor made the statement with fraudulent intent. *Keeney v. Smith (In re Smith)*, 227 F.3d 679, 685 (6th Cir.2000); *Hamo*, 233 B.R. at 725. Statements made in bankruptcy schedules, statement of financial affairs and at 341 meetings are given under oath. *Hamo*, 233 B.R. at 725; *United States Trustee v. Winters (In re Winters)*, 2008 WL 202774, at *4 (Bankr. N.D.Ohio Jan.22, 2008); *Ayers v. Babb (In re Babb)*, 358 B.R. 343, 355 (Bankr. E.D.Tenn.2006). Testimony or statements made during depositions or 2004 examinations are also under oath. *Babb*, 358 B.R. at 355. Further, such statements are material if they concern "discovery of assets, business dealings or [the] existence or disposition of property." *Hamo*, 233 B.R. at 725 (further citations omitted). *See also Keeney*, 227 F.3d at 686. "Knowledge may be shown by demonstrating that the debtor knew the truth, but nonetheless failed to give the information or gave contradictory information." *Id.*

With regard to the intent element, direct evidence of intent is not required. *Winters*, 2008 WL 202774, at *5; *Harker v. West (In re West)*, 328 B.R. 736, 750 (Bankr.S.D.Ohio 2004). Instead, intent may be inferred from circumstantial evidence or the debtor's course of conduct. *Winters*, 2008 WL 202774, at *5; *West*, 328 B.R. at 750 (noting that resolution of this issue will often turn on the court's assessment of the demeanor and credibility of the debtor). Furthermore, while mistakes do not warrant a denial of discharge, reckless indifference or disregard can provide the foundation for a finding of fraudulent intent. *Id. See also Hamo*, 233 B.R. at 725 ("A false statement or omission that is made by mistake or inadvertence is not sufficient grounds upon which to base the denial of a discharge, but a knowingly false statement or omission made by the Debtor with reckless indifference to the truth will suffice as grounds for the denial of a Chapter 7 general discharge.")

---

4. Section 727(a)(4) of the Bankruptcy Code provides that a discharge should be denied when:

 (4) the debtor knowingly and fraudulently, in or in connection with the case—

 (A) made a false oath or account;

 (B) presented or used a false claim;

 (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

 (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs[.]

This particular exception to discharge is more difficult for the Trustee to prove because Mr. Johnson, at those times when he testified under oath—throughout the extended § 341 meeting, depositions, and trial—seldom made detailed affirmative statements and frequently answered "I don't know" or "I don't recall." There are a number of omissions and errors in his schedules and statement of financial affairs, but some of these are arguably due to the limited counseling provided by the Debtors' bankruptcy attorney who admitted that he only met with them once and did not carefully review the schedules with them before they executed the documents.

Nevertheless, even when giving Mr. Johnson the benefit of the doubt on many of these misstatements, the aggregation of falsehoods and evasions as to the existence and status of assets and liabilities paints a picture of knowing falsehood and fraudulent intent. An examination and itemization of the more significant false statements makes this more clear.

Setting aside the misstatements and errors for which Mr. Johnson supplied at least a theoretically plausible explanation or excuse, there remain some fairly significant falsehoods for which there is no credible defense. In his joint schedules with Mrs. Johnson, Mr. Johnson listed on schedule B "household goods and furnishings" with a value of $3,000.00; "books, pictures and other art objects" with a value of $1,000.00; "wearing apparel" with a value of $800.00; and "furs and jewelry" with a value of $1,000.00. Although the contents of the Johnsons' home were apparently never appraised, the senior investigator for Chase, having visited the premises, testified as follows:

> There was clothing almost everywhere. In fact, in the downstairs rec room or family room there was a number of storage, cloth hanging units for clothing and you open it up and, again, full of cloth-ing. Almost all the closets were heavily packed with clothing, shoes, a lot of designer label type shoes and just an inordinate amount of clothing.

* * *

> Fully furnished, heavily packed house. For the size of the house I was amazed at how much stuff was in it.

When these general observations are coupled with the extravagant expenditures evidenced by the couple's credit card statements and Mrs. Johnson's testimony regarding her excessive shopping, the amounts listed on the schedules are simply not credible. Furthermore, the Johnson's failed to schedule fairly expensive imported Ello Italian furniture still in the original shipping cartons that was stored in a warehouse. The value of the furniture was not definitively established although the owner of the warehouse and installation company, who was familiar with such furniture in his business experience, estimated its retail value at between $10,000.00 and $15,000.00, a valuation Mr. Johnson did not dispute. Mr. Johnson failed to disclose this furniture and failed to amend his bankruptcy schedules even after the Trustee discovered it. His only explanation was that it was an "oversight" and that he thought the value of the furniture might have depreciated.

The situation with the Italian furniture exemplifies a pattern of conduct exhibited by Mr. Johnson throughout his bankruptcy case. Generally, the pattern was to reveal at the outset of the case only the minimum amount of information necessary, to resist additional disclosures of information, to make it difficult for the Trustee and creditors to obtain documentation, to claim inadvertence or impossibility when the Trustee discovered an undisclosed asset, and then fail to amend the schedules or amend them only belatedly. When given an op-

portunity to disclose the Italian furniture at the deposition conducted by the Trustee on August 28, 2007, Mr. Johnson readily disclosed his possession of used inherited furniture held in storage, but did not reveal the new Italian furniture and was generally vague and evasive:

> THE TRUSTEE: There's no furniture, jewelry, office equipment, or anything else at any other location, is that correct?
>
> MR. JOHNSON: No, not that I'm aware of. Well, my wife has—we had—my wife put some—her grandmother's—when she was executor of her estate, she got left some furniture for her—from her grandmother and a—got a little storage.
>
> THE TRUSTEE: Any other things you can think of?
>
> MR. JOHNSON: No.

In similar fashion, when directly questioned at the First Meeting of Creditors on November 15, 2006 about whether he was entitled to any tax refunds at the time of bankruptcy filing, Mr. Johnson responded with an unqualified "no." In fact, he and Mrs. Johnson received a refund check of $1,217.57 shortly after filing bankruptcy which Mr. Johnson endorsed and deposited a month before he was questioned about it. The refund was never disclosed by Mr. Johnson by amending his schedules or otherwise and when confronted with this information at trial, he claimed to be "confused" and surmised that he may not have understood the Trustee's question. When the Trustee attempted to collect the tax refund and other undisclosed funds from Mr. Johnson, he failed to comply. When asked at trial why he failed to pay the money as requested, Mr. Johnson stated that he did not have the money. However, when questioned more closely, it became clear that Mr. Johnson's statement was false: He had funds available, but chose to allocate those funds to other purposes.

Another significant nondisclosure was the transfer of the so-called Meeker property to Mr. Perrin, Mr. Johnson's elderly father. The deed to Mr. Perrin was executed a few months before the Johnson bankruptcy filing and was recorded approximately two months prior to the filing. According to Mr. Johnson, this undisclosed real estate transfer was at Mr. Perrin's request as collateral for previous periodic undocumented loans amounting to as much as $75,000.00. The following exchange is from Mr. Johnson's deposition transcript of August 28, 2007:

> THE TRUSTEE: Was that [the Meeker property] transferred to him to try to help protect him on his loans or what?
>
> MR. JOHNSON: Well, that's definitely what it was. That's what he told me after so—after so—after about that last—that loan, he said, listen, why don't you do that. And that way, if you can't pay me back, I'll have some collateral. So basically it was just for collateral. There was no hidden agenda.

At trial, however, Mr. Perrin emphatically and convincingly denied loaning money to his son or daughter-in-law prior to the bankruptcy. He also contradicted his son's testimony regarding the real estate transfer:

> THE TRUSTEE: Did Bernard or Nicole Johnson ever request you to have real estate transferred into your name?
>
> MR. JOHNSON: Bernard did.
>
> THE TRUSTEE: And what did you tell him?
>
> MR. JOHNSON: Told him no.

The court finds Mr. Perrin's testimony to be more credible and concludes that Mr. Johnson was not truthful regarding the disposition of the Meeker real estate. The more likely scenario was that Mr. Johnson

deeded the property to his father to protect it from creditors and then purposefully failed to disclose the transfer in his statement of financial affairs or otherwise. As has been typical throughout these proceedings, the Trustee had to discover the existence and transfer of the Meeker property through his own diligent search and, when Mr. Johnson was confronted with the evidence, he was ready with an excuse.

The enumeration of misstatements and inconsistent statements could continue, but the point is that in the aggregate, when accompanied by unlikely or vague explanations and excuses, they paint a comprehensive picture of evasiveness and prevarication. This conclusion is significantly reinforced by Mr. Johnson's history in this case of noncompliance with discovery requests and his blatant obstructionism and contempt for the truth while under oath at the first meeting of creditors. The following excerpts from the transcript of that meeting best illustrate this course of conduct by Mr. Johnson as he is questioned by counsel for Chase:

> MR. BEYER: You filed a 2005 income tax return, correct?
>
> MR. JOHNSON: Are we done?
>
> THE TRUSTEE: You have to answer his questions.
>
> MR. JOHNSON: Well, I'll plead the Fifth on everything he's asking me.
>
> THE TRUSTEE: I can't make rulings because I'm not a judicial official.
>
> MR. BEYER: I understand. Who filed your—who signed your 2005 income tax returns for you?
>
> MR. JOHNSON: You have it right there. You tell us.
>
> MR. BEYER: No, I'm asking you to tell me.
>
> MR. JOHNSON: I don't recall. I don't recall.
>
> * * *

> MR. BEYER: Whom do you consult with to file your 2005 income tax returns? Answer the question, please.
>
> THE TRUSTEE: You have to answer or you have to give him a response of some nature.
>
> MRS. JOHNSON: I'm not answering your questions.
>
> MR. BEYER: Bernard, who filed your 2005—
>
> MR. JOHNSON: I don't know. I didn't deal with it.
>
> MR. BEYER: All right. I'm going to hand you a copy of your 05 return. That is your return, is it not?
>
> MRS. JOHNSON: I'm not answering your question.
>
> MR. BEYER: Mr. Johnson?
>
> MR. JOHNSON: I don't have my legal counsel here to answer any questions from you.
>
> MR. BEYER: Counsel is sitting—
>
> MRS. JOHNSON: He's the bankruptcy.
>
> MR. JOHNSON: He's the bankruptcy counsel only.
>
> * * *

> MR. BEYER: According to your statement of intent, you intend to reaffirm your debt both to Fifth Third Bank and National City Mortgage; is that correct?
>
> MR. JOHNSON: I don't recall at this time.
>
> MR. BEYER: I'm sorry?
>
> MR. JOHNSON: Don't recall at this time the question.
>
> MR. BEYER: Well, let me give you a copy of your statement of intention.
>
> MR. JOHNSON: I don't need it.
>
> MRS.JOHNSON: Take it back.
>
> MR. BEYER: Well, if you don't recall it, it'll refresh your memory.
>
> MRS. JOHNSON: Take it back.
>
> MR. JOHNSON: I don't need it.

MR. BEYER: Take a look at it—

MRS. JOHNSON: Take it back.

MR. BEYER:—and refresh your memory. According to this filing you have made, Mr. and Mrs. Johnson, you intend to reaffirm your debt to National City Bank and Fifth Third Mortgage. Is that still correct sitting here today?

MR. JOHNSON: I plead the Fifth.

MRS. JOHNSON: I'm not answering your questions.

MR. BEYER: How are you going to pay your loans when yon only make forty bucks a month?

MRS. JOHNSON: I'm not answering your questions.

MR. BEYER: Mr. Johnson, how much do you make at AK Steel?

MR. JOHNSON: I plead the Fifth, man.

MR. BEYER: The Fifth Amendment's not implicated by how much money you're earning today.

MR. JOHNSON: I'm not answering your question.

MRS. JOHNSON: Fifth.

MR. BEYER: When did you start working at AK Steel?

MR. JOHNSON: I'm not answering your questions.

MR. BEYER: Who's your boss?

MR. JOHNSON: Nicole Johnson.

MR. BEYER: Who's your boss at AK Steel?

THE TRUSTEE: I'm going to instruct you—this is not funny.

MR. JOHNSON: I'm not being funny.

MRS. JOHNSON: Oh, he's the one being funny.

MR. JOHNSON: He asked me who my boss was.

THE TRUSTEE: If you don't answer responsibly, I'm going to conclude this and I'll bring you up in front of the judge and I'm going to have him instruct you that if you don't answer the questions that you're asked that aren't—have any kind of privilege assessed, he'll put you in contempt of court. You've got enough troubles; I wouldn't build with them now. So, you either answer the questions or take the Fifth. Don't be silly.

MR. JOHNSON: We weren't trying to be silly.

MRS. JOHNSON: He started it.

THE TRUSTEE: Just go ahead.

MR. BEYER: Who's your boss at AK Steel?

MR. JOHNSON: I plead the Fifth.

MRS. JOHNSON: I'm not answering your questions.

MR. BEYER: How does that have anything to do with Fifth Amendment?

MRS. JOHNSON: I'm not answering your questions.

MR. BEYER: Mr. Farley, would you instruct your client to answer the question, please?

MR. FARLEY: Just answer—

MRS. JOHNSON: I'm not answering the questions. Plead the Fifth. We don't have no answer.

MR. JOHNSON: I don't have an answer.

MRS. JOHNSON: We don't have an answer.

MR. BEYER: Who's your boss?

MR. JOHNSON: I got none. I don't have a particular boss.

MR. BEYER: Who are all your bosses?

MR. JOHNSON: I—I don't have a foreman. I just started. I don't remember.

* * *

MR. BEYER: How are you guys going to pay these notes?

MR. JOHNSON: None of your business.

MR. BEYER: It is.

MR. JOHNSON: No, it isn't.

MRS. JOHNSON: No, it's not, Marty.

MR. BEYER: Mr. and Mrs. Johnson, you're the ones who filed bankruptcy, so I'm entitled to ask you these questions.

MR. JOHNSON: Yes. I'm working, so what do you think?

MR. BEYER: Well, I think that you're not answering my questions.

MR. JOHNSON: I answered your question. I'm working. I will pay when I get paid. When I get paid, I will pay National City. That's it.

MR. BEYER: Okay. You make how much money?

MR. JOHNSON: I don't really know. I just started.

* * *

MR. BEYER: Do you get paid hourly or salary?

MR. JOHNSON: I don't recall.

* * *

MR. BEYER: What is your hourly rate, Mr. Johnson?

MR. JOHNSON: I don't know.

MR. BEYER: You have no idea?

MR. JOHNSON: No. It changes.

* * *

MR. BEYER: Good, Now, how much do you get paid for your overtime?

MR. JOHNSON: I don't know. I really don't know.

MR. BEYER: So, you get—you can get paid twenty-five dollars and—for working a week and that wouldn't faze you? You have no idea?

MR. JOHNSON: Don't be ridiculous. Ask some sensible questions.

MR. BEYER: Sir, I'm just trying to have you—

MR. JOHNSON: No, you're trying to abuse your privileges that they're giving you here. Ask sensible questions or I'm not going to answer any more of your questions. You're lucky I'm doing this.

MRS. JOHNSON: Really.

MR. BEYER: Sir, my question is—

MR. JOHNSON: I know what your question were. Answer a sensible question.

MR. BEYER: I'm asking a question.

MR. JOHNSON: I don't know. Yeah, I'll take twenty-five dollars.

* * *

MR. BEYER: Do you—do they give you a check on Fridays?

MR. JOHNSON: Give it to her.

MR. BEYER: What?

MR. JOHNSON: They give it to her. They mail it to her.

MR. BEYER: They mail it to her. To your house?

MR. JOHNSON: No, man, a tree house. Come on, these crazy questions you're asking me, man. Jesus man, come on.

Nothing is more material in a bankruptcy case than full and honest disclosure of assets and liabilities under oath. The foregoing interchange between the Johnsons and counsel for Chase is symptomatic of the difficulty the Trustee and creditors have had in verifying the assets and liabilities of the Debtors. Even after a number of additional assets and liabilities were discovered during the months since the Johnsons filed their case, including those discussed above plus many thousands of dollars in debt owed to friends and relatives that were not listed, the Debtors never amended their schedules other than to correct the balances in their credit union accounts, an amendment filed more than seven months after they filed their bankruptcy petition. Had Mr. Johnson and his wife promptly amended their schedules early in the case, that might have minimized the inference of falsehood and fraud. However, a complete failure to amend the schedules, or a very belated

amendment long after discovery and the initiation of adversary proceedings makes their indifference to the truth even more pronounced. *See Babb*, 358 B.R. at 358–59. Furthermore, given Mr. Johnson's pattern of uncooperative conduct, neither the Trustee nor this court can have any confidence that Mr. Johnson has fully and truthfully disclosed all of his assets. These facts and circumstances give rise to a reasonable and inescapable inference that Mr. Johnson knew that many of his statements were false and that he made those statements with fraudulent intent. Consequently, the combination of his specific false statements and nondisclosures in the schedules, evasive and misleading testimony, and blatant attempts to thwart rather than cooperate with the discovery process are more than sufficient to justify denial of Mr. Johnson's discharge.

### D. *11 U.S.C. § 727(a)(2)(B): Transfer or Concealment of Property and 11 U.S.C. § 727(a)(6): Refusal to Obey Lawful Order of the Court*

The Trustee also objects to Mr. Johnson's discharge pursuant to 11 U.S.C. § 727(a)(2)(B)[5] and § 727(a)(6). Because the court has already determined that Mr. Johnson's discharge must be denied pursuant to 11 U.S.C. § 727(a)(3), (4), and (5), it is unnecessary to fully consider the Trustee's remaining two causes of action. Furthermore, while it is certainly arguable under the facts of this case that Mr. Johnson's discharge should be denied under these provisions as well, the court does not believe the Trustee has met his burden of proof.

Section 727(a)(2)(B) provides that a discharge should be denied to a debtor who:

> 2) . . . with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> (B) property of the estate, after the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2)(B). The intent of this section is to deny discharge to a debtor who "fails to disclose transactions regarding his assets subsequent to filing his petition for bankruptcy." *Sicherman v. Rivera (In re Rivera)*, 338 B.R. 318, 328 (Bankr.N.D.Ohio 2006) (quoting *In re Caserta*, 182 B.R. 599, 606 (Bankr.S.D.Fla. 1995)). This provision requires the objecting party to prove: 1) that the debtor transferred, removed, destroyed, mutilated or concealed property of his bankruptcy estate after the petition filing date; and 2) the conduct occurred with actual intent to hinder, delay or defraud a creditor or officer of the estate. *Harker v. West (In re West)*, 328 B.R. 736, 752 (Bankr.S.D.Ohio 2004); *Hunter v. Sowers (In re Sowers)*, 229 B.R. 151, 156 (Bankr.N.D.Ohio 1998).

While there is some evidence in this case of inappropriate prepetition property transfers and a number of false and misleading statements under oath, there is little evidence of postpetition transfers. There is certainly a pattern of nondisclosure of assets, but those matters have already been addressed and fit more readi-

---

**5.** The Trustee's trial brief and closing argument focus on the elements of § 727(a)(2)(B) relating to a Debtor's post-petition transfers, destruction or concealment of property rather than § 727(a)(2)(A) which concerns a Debtor's prepetition transfers, destruction or concealment of property. As such, the court will not discuss § 727(a)(2)(A) in this decision.

ly within the elements of the Trustee's other causes of action.

 The Trustee's other count proceeds under § 727(a)(6) which provides that a discharge should be denied when:

(6) the debtor has refused, in the case—

(A) to obey any lawful order of the court, other than an order to respond to a material question or to testify;

(B) on the ground of privilege against self-incrimination, to respond to a material question approved by the court or to testify, after the debtor has been granted immunity with respect to the matter concerning which such privilege was invoked; or

(C) on a ground other than the properly invoked privilege against self-incrimination, to respond to a material question approved by the court or to testify[.]

11 U.S.C. § 727(a)(6). Because noncompliance is not the equivalent of a "refusal" to comply, courts have concluded that the mere failure or inability to comply with a court order, by itself, does not warrant a denial or revocation of discharge. *Sicherman v. Rivera (In re Rivera)*, 338 B.R. 318, 329 (Bankr.N.D.Ohio 2006); *Solomon v. Barman (In re Barman)*, 237 B.R. 342, 349 (Bankr.E.D.Mich.1999); *Hunter v. Magack (In re Magack)*, 247 B.R. 406, 409–10 (Bankr.N.D.Ohio 1999). Instead, courts require a higher standard of proof such as that needed to demonstrate civil contempt. *Magack*, 247 B.R. at 410. To prove civil contempt, the Trustee must establish, by clear and convincing evidence, that: 1) the alleged contemnor had knowledge of the order; 2) the order was in fact violated; and 3) the order violated must have been specific and definite. *Magack*,

247 B.R. at 410. *See also Rivera*, 338 B.R. at 329 (noting that a denial of discharge is appropriate if the debtor knew of or should have known of the multitude of orders and disregarded them).

During the pendency of Mr. Johnson's bankruptcy, the court has held him in contempt at least once, and he was subject to a second motion for sanctions as of the time of trial, although the Trustee chose not to pursue the matter. It is arguable, and the Trustee does indeed argue, that Mr. Johnson violated this court's orders compelling him to provide documents and information to the Trustee. However, the court made no final determination as to the sufficiency of his compliance with such discovery orders prior to trial. During the trial itself, it was certainly clear that Mr. Johnson did not reasonably cooperate in providing the ordered discovery, but the evidence was simply not thorough or conclusive enough to allow the court to deny his discharge on this basis alone.

### CONCLUSION

For the reasons set forth above, and pursuant to 11 U.S.C. § 727(a)(3), (4), and (5), the court hereby **DENIES** Debtor Bernard E. Johnson a discharge in bankruptcy.

**IT IS SO ORDERED.**